For example, in *State v. Penn*, we approved of a jury instruction that defined willfully as "purposefully and intentionally, and not by accident, mistake or inadvertence." 2003 VT 110, ¶ 9, 176 Vt. 565, 845 A.2d 313 (mem.) (quotations omitted). Thus, the trial court did conclude that defendant engaged in willful conduct, and thereby foreclosed defendant's claim that his contact with his victim at the Price Chopper was accidental or unintentional.

¶ 16. The trial court's conclusion is well supported by the findings. As discussed, the group's no-contact policy extends beyond those situations where a group member goes to a certain place at a certain time with the specific intent to contact his victim. It also embraces those encounters that are initially accidental or inadvertent, but that become intentional once defendant realizes that he is in the presence of his victim, but fails to timely remove himself from the victim's vicinity. The trial court found that defendant continued to stand directly behind J.N. in the customer service line even though he knew that she was there and that he had an obligation to leave after recognizing her. The court further found that he waited there until she finished her business and was so close to her that he had to move out of the way so that she could pass. These findings fully support the court's conclusion that defendant intended to violate the group's prohibition on victim contact. As we noted in *Danaher*, this Court may presume that the trial court "properly inferred essential facts from its factual findings." 174 Vt. at 593, 819 A.2d at 694. This includes mixed questions like those surrounding intent, because intent is almost always inferred from subsidiary facts. *Id.* at 596, 819 A.2d at 697 (Dooley, J., dissenting).

¶ 17. The court's conclusion is not weakened by the credible evidence that defendant had an innocent purpose for being at the Price Chopper at the time,

and that defendant had no reason to expect that his victim would also be there. In this case, evidence that goes to defendant's mental state prior to the point at which he found himself in the presence of his victim is substantially less important than evidence of defendant's reaction to the situation.

¶ 18. The trial court's review of defendant's history in the group confirms its conclusion that, given how long defendant had been in the group, he should have had more success in abiding by group rules prohibiting victim contact. Though defendant had shown some progress, that progress was marked by "fits and starts." Defendant's history of failing to abide by the group's no-contact guidelines, only some of which has been recounted here, retarded and often derailed defendant's treatment. As a result of this chronic failure to respect a group policy aimed at minimizing risk factors for recidivism, the trial court properly concluded that defendant has not participated satisfactorily in the group. The trial court reached this conclusion after showing proper sensitivity for defendant's constitutional rights. Therefore, the violation must be upheld. See *Masse*, 164 Vt. at 632, 674 A.2d at 1256 (upholding probation violation based on trial court's conclusion that defendant had not progressed satisfactorily in sex offender treatment).

*Affirmed.*

2005 VT 60

**In re M.C.**

[878 A.2d 284]

No. 03-492

¶ 1. June 1, 2005. M.C. appeals the Lamoille Family Court's decision to re-

new his order of nonhospitalization (ONH). M.C. contends that the court erred in renewing his court-ordered treatment program when there was evidence that he is capable of continuing treatment voluntarily. We affirm.

¶ 2. M.C. is a 53-year-old man who suffers from chronic paranoid schizophrenia and experiences auditory hallucinations and delusional beliefs. He was hospitalized on several occasions during the 1970s, and, following his discharge on an ONH in 1981, he attempted to kill his brother with a shotgun. He was then committed to the Vermont State Hospital, where he remained until 1987. Since that time he has lived at a group home in Johnson, where he is supervised and receives anti-psychotic medication as his ONH requires.

¶ 3. M.C.'s ONH was initially of unlimited duration, but in 1998 Vermont law was changed to require annual judicial review. See 18 V.S.A. § 7621(c) (limiting court-ordered periods of treatment to one year). He has remained on an ONH since that time; some years by agreement of the parties and some years pursuant to a court order. When the State filed an application to renew M.C.'s ONH in April 2003, however, his attorney asserted that renewal was unwarranted because a voluntary course of treatment is feasible in his case. The family court concluded that M.C. remains a "patient in need of further treatment" pursuant to § 7101(16)(B),[1] and that the ONH was

the least restrictive means of administering that treatment. The court then renewed the ONH, and this appeal followed.

¶ 4. In judicial proceedings where involuntary mental health treatment is at issue, the State must prove its case by clear and convincing evidence. In re E.T., 2004 VT 111, ¶ 12, 177 Vt. 405, 865 A.2d 416. Once a patient raises the issue of voluntary treatment,[2] the State must produce clear and convincing evidence that such treatment "is not feasible." Id. (citations and quotations omitted). Our review of the family court's decision is deferential, however, and we will reverse only if the court clearly erred in finding the requisite factual predicates. Id. ¶ 13 (citations and quotations omitted).

¶ 5. At the hearing below, the State presented the testimony of Dr. Judy Nepveu, M.C.'s treating physician at the group home. Dr. Nepveu testified that, despite taking medication, M.C. continues to hallucinate and hear voices coming from a "talking spot" on his forehead. He remains delusional, and sometimes be-

---

[1] The statute defines a "patient in need of further treatment" as: "A patient who is receiving adequate treatment, and who, if such treatment is discontinued, presents a substantial probability that in the near future his condition will deteriorate and he will become a person in need of treatment." 18 V.S.A. § 7101(16)(B). A "person in need of treatment" is: "[A]

person who is suffering from mental illness and, as a result of that mental illness, his capacity to exercise self-control, judgment or discretion in the conduct of his affairs and social relations is so lessened that he poses a danger of harm to himself or others." Id. § 7101(17).

[2] Despite the State's contentions that M.C. has not raised the issue of voluntary treatment in "good faith," the arguments that M.C.'s attorney advanced in the family court were sufficient to put voluntary treatment in issue. See In re E.T., 2004 VT 111, ¶ 7. ("[A] request, made through counsel in response to an application for continued treatment, [is] sufficient to put voluntary treatment in issue.").

lieves that familiar people have been taken over by "imposter[s]." Dr. Nepveu opined that M.C. is so preoccupied with his delusions that he is incapable of taking care of himself, and has to be reminded to perform basic daily tasks. She further testified that he lacks insight into his mental illness and does not understand the need to continue taking medication. She therefore expressed strong doubt that he is capable of continuing his treatment program voluntarily. After suggesting that M.C. is "just as dangerous as he ever was," Dr. Nepveu concluded that "he needs to be under a court order because he has no idea that he needs help. And without help he would become dangerous . . . ."

¶ 6. Dr. Robert Linder then testified on M.C.'s behalf. Dr. Linder said that he had evaluated M.C. several times since 1993, and that he had met with him twice in 2003 in preparation for the hearing. He testified that he had noticed some recent improvement in M.C.'s attitude toward his family and his medication, and said that M.C. now believes that he is "going to need to take medication indefinitely." He agreed with Dr. Nepveu that M.C. lacks substantial insight into his mental illness, but suggested that he does recognize that he has been diagnosed with schizophrenia. He went on to say that M.C. has expressed a desire to be discharged from his ONH, and concluded that M.C. would voluntarily participate in treatment and services if he were not subject to the court order.

¶ 7. The court found Dr. Linder's testimony ambivalent on the issue of whether M.C. was capable of complying with his treatment program in an unsupervised setting. Given Dr. Nepveu's testimony, the court found that M.C. remained a "patient in need of further treatment," 18 V.S.A. § 7101(16), and further found that voluntary treatment was not feasible. It concluded that the State had met the statutory require-

ments, demonstrating by clear and convincing evidence that M.C. required further treatment, and further showing that the ONH was the least restrictive means of providing such treatment and protecting the public. The court then renewed the ONH for another year. On appeal, M.C. does not dispute that he needs further treatment, but he contends that the court erred in finding voluntary treatment is not feasible in his case.

¶ 8. In *In re R.L.*, we held that the family court should consider several factors in determining whether voluntary treatment is feasible for a particular patient, including "the patient's capacity to consent to voluntary treatment, the impact voluntary treatment may have on the patient's treatment plan, and whether the patient would, in fact, accept voluntary treatment." 163 Vt. 168, 174, 657 A.2d 180, 184-85 (1995). That case dealt with a patient facing involuntary hospitalization, however, and we have recognized that "the feasibility of voluntary treatment involves additional considerations when the patient is no longer in the hospital." *In re E.T.*, 2004 VT 111, ¶ 11. In such a circumstance, it is appropriate for the court to also consider "the danger a patient poses to the community if treatment is discontinued." *Id.*

¶ 9. There is adequate evidence in the record to support the family court's finding that the State carried its burden in this case. Clear and convincing evidence is a demanding standard, but it "does not require that evidence in support of a fact be uncontradicted, . . . [only] that the fact's existence be highly probable." *Id.* ¶ 12 (quotations omitted). In light of Dr. Nepveu's testimony, the court did not clearly err in finding that M.C. lacked the capacity to consent to voluntary treatment, and that his potential failure to continue treatment would present a danger to the public. These findings, in turn, support the determination that M.C. remains a patient in need

of further treatment for whom voluntary treatment is not feasible. Accordingly, we affirm the court's order renewing appellant's ONH.

*Affirmed.*

2005 VT 61

**In re ESTATE OF Sara MAINOLFI**

[878 A.2d 287]

No. 04-241

¶ 1. June 1, 2005. The estate of Sara Mainolfi appeals an order by the Rutland Superior Court affirming a probate court decision awarding a $75,000 homestead interest in her former home to the estate of her husband, Frank Mainolfi. The trial court determined that Frank Mainolfi's quitclaim deed conveying "all right and title" in the marital home did not convey his homestead interest to his wife because the interest had not yet vested at the time of the deed, and that his estate was therefore entitled to the $75,000 homestead interest after her death. We affirm. Title 27 V.S.A. § 105 vests a surviving spouse with the same interest in the homestead with which the decedent spouse was vested at death, and neither spouse can transfer or waive the homestead interest before it vests.

¶ 2. Sara and Frank Mainolfi married and purchased a home in Rutland, Vermont. They lived in the home together until Sara died on December 5, 2001. Frank continued to live in the home until he passed away three weeks later, intestate, on December 26. Neither Sara nor Frank had any children. Three written instruments form the background to the dispute between their estates.

¶ 3. First, a quitclaim deed, executed by both Sara and Frank in 1993, purported to "remise, release, and forever quitclaim[] . . . all right and title" in their home to their nephews, Albert Clarino and Thomas Olsen, and reserved a life estate for the Mainolfis. Second, another quitclaim deed, executed by the nephews and Frank Mainolfi in 1995, quitclaimed all right and title in the same home to Sara, reserving a life estate for Frank. Finally, Sara's will, executed the same day as the second quitclaim deed, devised her estate (minus debts, administrative expenses, and a bequest) to the nephews as tenants in common.[1]

¶ 4. The superior court determined that Frank Mainolfi's estate was entitled to a $75,000 interest in the proceeds from the sale of the home, pursuant to 27 V.S.A. § 101 and § 105. The superior court concluded that, because the homestead interest is inchoate while both spouses are still living and ripens into an absolute right only upon the death of one spouse, Frank Mainolfi's 1995 conveyance to his wife by quitclaim deed of "all right and title" in the marital home did not convey the homestead interest. Sara Mainolfi's estate appeals, challenging, first, the "interpretation of the legal effect of a conveyance by a husband to his wife of all his right and title in their marital residence." Second, appellant challenges the trial court's "assumptions of fact where they neglected to conduct an evidentiary hearing to support their decision" regarding the will- and deed-makers' intent. We consider each argument in turn.

---

[1] The will stipulated that, if Frank survived Sara by more than thirty days, the estate would be held in trust for him by Thomas Olsen; otherwise the estate would go to Olsen and Clarino as tenants in common. Because Frank survived Sara by only twenty-one days, the latter clause was given effect.