2007 VT 115

## In re T.C.

[940 A.2d 706]

Nos. 06-293 & 06-402

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed October 12, 2007

*Laura A. Gans*, Vermont Legal Aid, Inc., Waterbury, for Appellant (06-293) and Appellee (06-402).

*William H. Sorrell*, Attorney General, Montpelier, and *David Bond*, Assistant Attorney General, Burlington, for Appellee (06-293) and Appellant (06-402).

¶ 1. **Skoglund, J.** These consolidated cases arise from two separate family court proceedings involving T.C. In the first, T.C. appeals from the Washington Family Court's order granting the State's request for involuntary administration of medication. That order was stayed pending appeal. In the second, the State appeals the family court's order denying the State's application for continued treatment, and releasing T.C. from the Vermont State Hospital (VSH). Because we affirm the family court's denial of the motion for continued treatment, we do not reach the merits of the involuntary medication order.

¶ 2. T.C. is a forty-five-year-old man. On April 7, 2006, he was involuntarily committed on a ninety-day order of nonhospitalization by the Bennington Family Court after some of T.C.'s family members filed a petition. The court did not issue written findings of fact or conclusions of law, so the basis for the commitment is not in the record. The court revoked the nonhospitalization order on May 5, 2006 and ordered T.C. to be hospitalized at VSH for the duration of the commitment order. At VSH, T.C. refused all psychiatric medications.

¶ 3. On May 30, 2006, the State filed a petition with the Washington Family Court seeking an order for involuntary medication of T.C. The court, Judge Toor presiding, held a bench trial on June 9, 2006. T.C.'s brother, his sister, and his brother's fiancee testified for the State. In addition, the State presented the testimony of a second-year resident in psychiatry who had begun working with T.C. one week before the hearing. Craig Van Tuinen, M.D., a board-certified psychiatrist with over fifteen years of experience who had reviewed T.C.'s records and interviewed T.C. on two occasions, testified on behalf of T.C.

¶ 4. The psychiatry resident testified that T.C. was friendly and cooperative and that he denied that there was anything wrong with him. T.C. believed he was in the hospital because his family was conspiring against him and had put him there. The doctor noted that his initial impression had been that T.C. suffered from a delusional disorder but that currently he was considering a

diagnosis of schizophrenia. He testified that T.C. did not acknowledge any mental illness, and thus, did not see the need for medication. In addition, he refused the drugs because he did not want to be "like a zombie."

¶ 5. The family court found T.C. was mentally ill and that his mental illness had manifested itself several years ago with strange behaviors, including his belief that someone was taking pictures of him, manipulating the images and publishing them. He thought strangers were out to get him, and that there were video cameras in some new furniture. He once confronted a stranger with a camera because he was sure she had taken pictures of him. T.C.'s relationships with members of his family deteriorated during this period as well. He expressed a belief that they were conspiring against him, and he had become physically aggressive with his siblings.

¶ 6. The court found that T.C. had not exhibited delusional thoughts since coming to VSH but did not find this fact significant. Nor did the court find Dr. Van Tuinen's testimony helpful, noting that "[Dr. Van Tuinen] does not believe that [T.C.] has a mental illness, [but] that issue has already been addressed by the earlier court's finding that he is a patient in need of treatment." The family court issued an involuntary medication order, and T.C. appealed.

¶ 7. On July 3, 2006, the Commissioner of Health filed an application for continued treatment, as the original commitment order expired after ninety days. See 18 V.S.A. § 7620. To succeed on an application for continued treatment, the State must show, by clear and convincing evidence, that the patient is in need of further treatment as defined by statute. *Id.* §§ 7616(b), 7621(b), (c), (e). A "patient in need of further treatment" is either:

> (A) A person in need of treatment; or

> (B) A patient who is receiving adequate treatment, and who, if such treatment is discontinued, presents a substantial probability that in the near future his or her condition will deteriorate and he or she will become a person in need of treatment.

*Id.* § 7101(16). A "person in need of treatment," in turn, is:

> a person who is suffering from mental illness and, as a result of that mental illness, his or her capacity to

exercise self-control, judgment or discretion in the conduct of his or her affairs and social relations is so lessened that he or she poses a danger to himself, to herself, or others:

(A) A danger of harm to others may be shown by establishing that:

(i) he or she has inflicted or attempted to inflict bodily harm on another; or

(ii) by his or her threats or actions he or she has placed others in reasonable fear of physical harm to themselves; or

(iii) by his or her actions or inactions he or she has presented a danger to persons in his or her care.

(B) A danger of harm to himself or herself may be shown by establishing that:

(i) he or she has threatened or attempted suicide or serious bodily harm; or

(ii) he or she has behaved in such a manner as to indicate that he or she is unable, without supervision and the assistance of others, to satisfy his or her need for nourishment, personal or medical care, shelter, or self-protection and safety, so that it is probable that death, substantial physical bodily injury, serious mental deterioration or serious physical debilitation or disease will ensue unless adequate treatment is afforded.

*Id.* § 7101(17).

¶ 8. The State's application for continued treatment was heard on August 11, 2006. The court, Judge Reiss presiding, took testimony from Dr. Gellman, a second-year resident at VSH who had been working with T.C. for less than three weeks, and again from Dr. Van Tuinen, who had, since the hearing on involuntary medication, again met with T.C. for a forty-minute session. No family members testified. Dr. Gellman testified that T.C. was able to discuss his daily routine at the hospital and his life outside the hospital without exhibiting any symptoms of delusional thought

process. He testified that T.C.'s illness manifested itself in his refusal to accept his family's version of events that took place in 1999-2000, and that, when confronted with his family's version of events, he became angry.

¶ 9. Dr. Van Tuinen testified that T.C. may have suffered from depression and substance abuse in the past but that, during his admission to VSH, he had exhibited a consistent mental status in which no thought disorder had been reported. He found no support for a diagnosis of schizophrenia. He noted that there was "some question about a disorder of perception."[*] He noted that family members had reported significant delusions, and agreed that T.C. may have suffered from a delusional disorder, but suggested that the reported delusions all occurred in 1999-2000, when T.C. suffered from and was treated for substance abuse. The doctor opined that T.C.'s substance abuse may have contributed to his delusions. Dr. Van Tuinen further opined that T.C.'s version of past events was not implausible. He described a discordant family relationship evidenced by police reports documenting assaults on T.C. by his sister and her boyfriend. He noted that all but one of the reports of T.C.'s allegedly bizarre behavior come from family members and related to past events. Dr. Van Tuinen opined that T.C. did not, as of the hearing, present a danger to himself or to others.

¶ 10. The family court found that the State had not met its burden to prove by clear and convincing evidence that T.C. was a patient in need of further treatment. The court first noted that the State had not successfully demonstrated that T.C. suffered from schizophrenia. Based on Dr. Van Tuinen's testimony, and the testimony of staff who had observed T.C. while at VSH, the court found that the criteria for schizophrenia were not satisfied in T.C.'s case: there was no evidence of hallucinations; no disorganization in his speech, thought or behavior; he was not noted to have a flat affect; he was engaged in social relations on the unit and was friendly and cooperative. The court further found that the State had failed to prove by clear and convincing evidence that, as a result of a mental illness, T.C. presented a continuing danger of harm to himself or to others. The family court dismissed the

---

[*] " 'Mental illness' means a substantial disorder of thought, mood, perception, orientation, or memory, any of which grossly impairs judgment, behavior, capacity to recognize reality, or ability to meet the ordinary demands of life . . . ." 18 V.S.A. § 7101(14).

State's application for continued treatment and released T.C. The State appeals.

¶ 11. The State challenges the trial court's refusal to afford preclusive effect to the findings and conclusions of the prior medication order and the initial commitment order. The State also contends that the trial court erred in construing the relevant statutes so narrowly that it refused to consider T.C.'s dangerous behavior prior to his commitment and mental status during the period of commitment as sufficient to meet its burden of proof under the "patient in need of further treatment" evaluation. 18 V.S.A. § 7101(16). Finally, the State asserts that the trial court's findings are clearly erroneous in some respects.

¶ 12. This Court reviews a trial court's findings of fact in the light most favorable to the prevailing party, "disregarding the effect of modifying evidence, and we will not set them aside unless they are clearly erroneous." *In re M.B.*, 2004 VT 58, ¶ 6, 177 Vt. 481, 857 A.2d 772 (mem.). We "uphold the court's conclusions if they are consistent with the controlling law and are supported by the findings." *In re Tekram Partners*, 2005 VT 92, ¶ 7, 178 Vt. 628, 883 A.2d 1160 (mem.). To determine whether a trial court's conclusions of law are "consistent with the applicable law" we "exercise plenary, nondeferential review." *Id.* A "trial court's construction of [a] statute is a question of law" and thus will be reviewed under the "nondeferential and plenary" standard. *Hopkinton Scout Leaders Ass'n v. Town of Guilford*, 2004 VT 2, ¶ 5, 176 Vt. 577, 844 A.2d 753 (mem.).

¶ 13. The State first objects to the trial court's refusal to take judicial notice of the facts found in the prior commitment and medication orders in this case, and its refusal to give those orders preclusive effect. Additionally, the State argues that it should not be required to reprove, at each subsequent recommitment, that the patient met commitment criteria at the time of the original commitment. The State misunderstands the burden imposed by the court below.

¶ 14. "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." V.R.E. 201(b). A court may take judicial notice, whether requested or not, but "shall take judicial notice if requested by a party and supplied with the

necessary information." V.R.E. 201(c), (d). The Reporter's Notes recognize that "[n]either the Rules of Evidence nor the Rules of Civil and Criminal Procedure expressly cover judicial notice of the statutory and decisional law of Vermont," noting that "such matters . . . are more properly viewed as matters which the judge is bound to know by virtue of his office." Reporter's Notes, V.R.E. 201.

¶ 15. The court correctly held that the fact that the Bennington Family Court ordered hospitalization and that the Washington Family Court ordered that T.C. be involuntarily medicated were proper subjects of judicial notice. The court in this case ruled that it would not take judicial notice of the facts found in the involuntary medication order, as that order was on appeal. It further ruled that the content of testimony given in a previous proceeding, when offered to bring in testimony that was not before the court in the pending proceeding, was not an appropriate subject of judicial notice, citing *Jakab v. Jakab*, 163 Vt. 575, 578, 664 A.2d 261, 263 (1995) (holding court could properly take judicial notice of the fact of prior testimony, but could not use the content of that testimony as evidence in the proceeding before it). The State, however, argues that it did not request the court to take judicial notice of testimony presented in the earlier hearings, only of the findings of the courts in the two matters. While the State is understandably confused by the court's choice of supporting case law, the court went on to explain why judicial notice of the holdings of the earlier order would not answer the question presented to it by the State's motion for continued treatment.

¶ 16. The existence of a prior order is an appropriate subject of judicial notice. Thus, it can be judicially noted that, at the time the order of nonhospitalization was issued, the court found that T.C. suffered from a mental illness, was a person in need of treatment, and that a treatment program other than hospitalization was adequate to meet his treatment needs, as required to support such an order. See 18 V.S.A. §§ 7101(17), 7617, 7618(a). An order of nonhospitalization may be amended to one of hospitalization when the patient does not comply with the order, or when the alternative treatment has not been adequate to meet the patient's treatment needs. *Id.* § 7618(b). Based on a transcript excerpt of the modification hearing, the nonhospitalization order was apparently amended due to T.C.'s failure to participate in the counseling service programs ordered. Thus, the court could take

judicial notice that, at the time of the order of hospitalization, T.C. was a person in need of treatment and was hospitalized. See *Slade v. Slade*, 2005 VT 39, ¶ 5, 178 Vt. 540, 872 A.2d 367 (mem.) ("Where findings are neither requested nor made, this Court must assume that the trial court found every contested issue of fact necessary to sustain the judgment."). However, without any findings or conclusions of the committing court, only the statutory criteria for issuance of an order of hospitalization were available for judicial notice. It can be assumed that the court's statement that judicial notice could be taken of the two prior orders is indicative that it did indeed judicially notice the order of hospitalization as described above.

■ ¶ 17. The State argues that the reason given by the court for refusing to take judicial notice of the findings of fact in the involuntary medication order, that the order was on appeal, is also error. Even if the rationale was error, an issue we need not decide here, the court did not err in declining to rely on the findings contained therein. The issues involved in an involuntary medication order are not the same as those presented in an involuntary commitment order or any subsequent order for continued treatment. "Whereas involuntary commitment ultimately depends on whether a person has mental illness and poses a danger of harm to himself or others, involuntary medication depends on a person's ability to make decisions and appreciate their consequences. The facts underlying a patient's involuntary commitment cannot alone support involuntary medication." *In re L.A.*, 2006 VT 118, ¶ 14, 181 Vt. 34, 912 A.2d 977 (citations omitted).

■ ¶ 18. Further, the State's attempt to rely on prior orders to satisfy its evidentiary burden for continued treatment fails. The court properly held that neither the involuntary medication order nor the order of hospitalization were entitled to preclusive effect insofar as the State sought to rely on them to satisfy the essential elements of its application for continued treatment. Both the commitment and involuntary medication proceedings were separate and distinct from the continued treatment proceeding. Each type of proceeding is governed by different statutory procedures and legal standards. See 18 V.S.A. §§ 7612, 7624, 7620. The State distorts the statutory process by asserting that, without according "preclusive effect to [the] earlier findings so as to prevent collateral attack on the issue of whether the patient was properly

committed in the first instance" the court commits error. The State fails to recognize its burden at this stage.

■ ■ ¶ 19. The purpose of an application for continued treatment is to examine whether the State can meet its burden of proving by clear and convincing evidence that a patient who is involuntarily hospitalized *continues* to require treatment. 18 V.S.A. §§ 7620(a), 7621; cf. *In re G.K.*, 147 Vt. 174, 177-79, 514 A.2d 1031, 1032-34 (1986) (the State's application is a constitutionally required mechanism to review the status of persons subject to involuntary treatment orders to determine whether continued treatment is justified). To evaluate whether a patient continues to require treatment, the court must be convinced of the medical necessity for the treatment and the adequacy and appropriateness of the proffered treatment for the mental illness suffered. This is the State's burden to prove. *In re N.H.*, 168 Vt. 508, 511-12, 724 A.2d 467, 469 (1998). In decisions based on a person's mental status, few things are static, and patients involuntarily committed to the state hospital or found to be in need of further nonhospitalization treatment must be afforded an opportunity to revisit the issue of commitment at least annually. 18 V.S.A. § 7621(b), (c). In resolving the dispute before it, the court here properly considered current evidence of the patient's mental health in determining if T.C. was a patient in need of further treatment. It did not, as the State suggests, require the State to "reprove, at each subsequent recommitment, that the patient met commitment criteria at the time of the original commitment." The State was required to prove, by clear and convincing evidence, the facts necessary to support a petition for continued treatment of a person presently hospitalized, having been found at one time to be a person in need of treatment.

■ ■ ¶ 20. The State's argument on expert testimony fares no better. The State argues that the court should have disregarded testimony from T.C.'s expert to the extent it was inconsistent with previous decisions and thus should have been barred by the doctrine of issue preclusion. Issue preclusion "bars the subsequent relitigation of an issue that was actually litigated and decided in a prior case where that issue was necessary to the resolution of the dispute." *Scott v. City of Newport*, 2004 VT 64, ¶ 8, 177 Vt. 491, 857 A.2d 317 (mem.) (quotation omitted). However, the fact that Dr. Van Tuinen may have disagreed with the medical evidence

offered by the State at the initial hospitalization hearing is of no moment. His testimony at the hearing for continued treatment was not offered to challenge the initial finding that T.C. suffered from a mental illness at the time of his commitment. As noted by the family court, "[t]he passage of time may give rise to a new set of facts and expert opinions may change over time." The court properly considered the evidence offered by Dr. Van Tuinen on the issue of T.C.'s *present* mental-health status. A patient's mental status is not frozen in time. There was no error in the court's decision to consider Dr. Van Tuinen's testimony.

¶ 21. And, while not a model of clarity, the court's decision did not find that T.C. was not mentally ill. On the contrary, the court conceded that T.C. "may suffer from a mental illness," but went on to hold that the State had failed to prove that he suffered from schizophrenia specifically. It then went on to find that the State failed to demonstrate by clear and convincing evidence that, "as a result of a mental illness (whether [s]chizophrenia or some other mental illness)," T.C. met the definition of a person in need of treatment as found in 18 V.S.A. § 7101(17). (Internal quotation omitted.)

¶ 22. It was perhaps the court's reference to § 7101(17), the section that defines "a person in need of treatment," that caused the State to suggest that the court forced it "to once again show by direct evidence that *at the time of his commitment,* T.C. espoused bizarre delusions and as a result engaged in threatening and assaultive behavior." (Emphasis added.) However, the statute defines "a patient in need of further treatment" as either a person in need of treatment or a patient who is receiving treatment but whose condition would probably deteriorate should treatment be discontinued. *Id.* § 7101(16). While the court's ruling is a bit disjointed, the court did go on to hold that the State failed to prove T.C. was a danger to himself or to others and thus, "[b]ecause the State has not sustained its burden of establishing by clear and convincing evidence that [T.C.] was a 'patient in need of further treatment' at the time of the hearing, its application for continued treatment must be dismissed." Thus, the trial court appropriately analyzed both alternative definitions of "a patient in need of further treatment" before coming to its conclusion.

¶ 23. The two prior orders shed light on T.C.'s history; however, they did not decide the central question in the applica-

tion for continued treatment: whether, at the time of the hearing on the application for continued treatment, T.C. was a patient in need of further treatment. See *People v. Munoz*, 28 Cal. Rptr. 3d 295, 301 (Ct. App. 2005) (holding that the "fact of a prior . . . commitment does not change the fundamental issues to be litigated in extended commitment proceedings"). The fact that a person posed a threat of harm to himself or others at the time of an original commitment hearing does not mean he continues to pose the same threat months or years later. The central issue — the patient's current mental status and need for further treatment — cannot have been fully litigated in a prior proceeding. Nor, it should be noted, is it T.C.'s burden to show that his mental status has changed since the last determination by a court that he was a person in need of treatment. It was the State's burden to prove T.C. met the criteria for further treatment. "Any other result," the court found, "would . . . obviate the State's burden 'of establishing that there is a continuing need to strip the citizen of one of his most cherished rights.' " *In re G.K.*, 147 Vt. at 178, 514 A.2d at 1033. We agree. It would have been error for the trial court to give preclusive effect to the findings from earlier proceedings to determine the issue before it.

 ¶ 24. The State next argues that the trial court erred in refusing to consider T.C.'s dangerous behavior prior to commitment. As noted, the State did not present evidence of T.C.'s earlier behavior, deciding to rely on the findings of fact made in prior orders concerning T.C.'s behavior. It is true that a patient's history of violence may be taken into consideration in reviewing an application for continued treatment. *In re E.T.*, 2004 VT 111, ¶ 15, 177 Vt. 405, 865 A.2d 416. However, in *E.T.* we stated, "[i]t is not just E.T.'s history that guided the court here, however, but rather the combination of that history and the *present likelihood that he will rapidly deteriorate and become violent* if he stops taking his medication." *Id.* (emphasis added). Thus, while the patient's mental state at the time of an initial commitment hearing may assist the court in evaluating his current mental state, the State's burden of proof requires more than simply submitting the original commitment order and asserting that nothing has changed. See, e.g., *In re M.C.*, 2005 VT 60, ¶¶ 5-6, 178 Vt. 585, 878 A.2d 284 (mem.) (granting application for continued treatment where State's psychiatrist testified that patient's delusions and hallucinations persisted despite regular medication and patient

was unable to perform basic daily tasks or take care of himself). In *E.T.*, for example, the patient had a documented history of rapid mental decline triggered by his missing even one dose of medication. *E.T.*, 2004 VT 111, ¶ 2. In this case, the State's witness conceded that T.C. was unmedicated and still had not exhibited any threatening or aggressive behavior during the time he was in the hospital. The witness was concerned that T.C.'s behavior would change once he was released from the hospital due to his lack of insight into his mental illness. However, it is clear that the court did not credit that testimony. The court noted that, since his admission to VSH, T.C. had exhibited no signs that he was a danger to others, and that he had not assaulted, attempted to assault, or verbally or physically threatened any other person during an extended period of close observation. The court concluded that the State had failed to establish by clear and convincing evidence that as a result of his mental illness T.C. presented a continuing danger of harm to others. That is, the State did not show that if treatment was discontinued, T.C. would "present[] a substantial probability that in the near future his or her condition will deteriorate and he or she will become a person in need of treatment." 18 V.S.A. § 7101(16). While the court apparently did not rely on the evidence of dangerousness found by the court in the earlier orders, its reasoning is still sustainable. Relying on earlier evidence of his aggressive and dangerous behaviors prior to commitment would not have met the State's burden to prove that, without continuing treatment, T.C. presented a continuing danger of harm to himself or others. The court so found. While the evidence presented at the involuntary medication hearing included reported incidents of physical aggression that took place three or four months earlier, the court reasoned, that "[i]f such facts were held to preclude a re-examination of whether because of his mental illness, [T.C.] continues to present a danger of harms to others, he would never be released."

¶ 25. The State claims that the trial court erred in making certain factual findings. In particular, the State objects to the trial court's finding that the State's witness had diagnosed T.C. with schizophrenia to the exclusion of other disorders. It also objects to the finding that T.C.'s only delusion was the entrenched belief that his family is incorrect about a series of events that took place some time ago. Finally, it finds error in the court's reliance on Dr. Van Tuinen's testimony to a greater extent than Dr. Gellman's

testimony. The family court's findings of fact will stand on review "unless, taking the evidence in the light most favorable to the prevailing party, and excluding the effect of modifying evidence, there is no reasonable or credible evidence to support them." *Creed v. Clogston*, 2004 VT 34, ¶ 18, 176 Vt. 436, 852 A.2d 577; V.R.C.P. 52(a).

¶ 26. What the State fails to accept is that the trial court gave little weight to the testimony of the second-year resident due to his minimal exposure to the practice of psychiatry: six months of in-patient psychiatry while in medical school and a one-month rotation in public psychiatry in which he was currently engaged. The court ultimately concluded that "Dr. Gellman's expert opinion does not rise to the level of clear and convincing evidence." The factfinder is best situated to weigh evidence, and therefore, is entitled to weigh the testimony of the two experts, consider their respective expertise and give whatever weight it believes proper to the testimony of the witnesses presented. *In re N.H.*, 168 Vt. at 514, 724 A.2d at 471.

¶ 27. Nor was it error for the court to rely on the testimony of Dr. Van Tuinen and his conclusions about family dynamics for purposes of assessing T.C.'s version of past events. Dr. Van Tuinen's description of family dynamics in general was certainly within his realm of expertise, and it was the kind of information that the court could use in evaluating the relative weight to give to the expert testimony. The State, however, objects to the court's statement that "Dr. Van Tuinen further opined that [T.C.]'s version of past events is not implausible." The court did not adopt this conclusion as its own. Rather, it contrasted this conclusion with Dr. Gellman's opinion that T.C.'s version of past events currently qualifies as a delusion. These two statements are exactly the type of conflicting expert testimony that a fact-finder is particularly suited to adjudicate.

¶ 28. This Court has long recognized that confinement for compulsory psychological treatment represents a " 'massive curtailment of liberty' " necessitating a heightened standard of proof. See *In re W.H.*, 144 Vt. 595, 597, 481 A.2d 22, 24 (1984) (quoting *Humphrey v. Cady*, 405 U.S. 504, 509 (1972)). When dealing with a citizen's liberty in connection with a subject as mercurial as mental illness, the State must prove its case by clear and convincing evidence — the high burden of proof imposed by

the Legislature. 18 V.S.A. § 7616(b). As we noted in *N.H.*, "[g]iven the significant deprivation of liberty that results from an order of continued treatment, the clear-and-convincing evidence standard should operate as a fundamental caution upon the minds of all judges, barring such orders unless the evidence results in a firm conviction as to the truth of the allegations to be established." 168 Vt. at 512, 724 A.2d at 470. Here, the court correctly found that the State failed to meet that burden. Because we affirm the court's denial of continued treatment, the appeal of the involuntary medication order is moot.

*Docket number 2006-402 is affirmed. Docket number 2006-293 is dismissed as moot.*