NOTICE: This opinion is subject to motions for reargument under V



In
re T.C. (2006-293 & 2006-402)

 

2007
VT 115

 

[Filed
12-Oct-2007]

 

NOTICE: 
This opinion is subject to motions for reargument under V.R.A.P. 40 as well as
formal revision before publication in the Vermont Reports.  Readers are
requested to notify the Reporter of Decisions, Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801 of any errors in order that corrections may
be made before this opinion goes to press.

 

 

                                                                    2007
VT 115

 

                                                        Nos.
2006-293 & 2006-402

 

 

In re T.C.                                                                                          Supreme
Court

 

On
Appeal from

Washington Family Court

 

March
Term, 2007

 

Helen M. Toor,
J. (06-293)

Christina Reiss,
J. (06-402)

 

Laura A. Gans,
Vermont Legal Aid, Inc., Waterbury, for Appellant (06-293) and Appellee 

  (06-402).

 

William H.
Sorrell, Attorney General, Montpelier, and David Bond, Assistant Attorney
General,

  Burlington, for Appellee (06-293) and Appellant (06-402). 

 

 

PRESENT: 
Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.

 

¶ 
1.          
SKOGLUND,
J.  
These consolidated cases arise from two separate family court proceedings
involving T.C.  In the first, T.C. appeals from the Washington Family Court’s
order granting the State’s request for involuntary administration of
medication.  That order was stayed pending appeal.  In the second, the State
appeals the family court’s order denying the State’s application for continued
treatment, and releasing T.C. from the Vermont State Hospital (VSH).  Because
we affirm the family court’s denial of the motion for continued treatment, we
do not reach the merits of the involuntary medication order.  







¶ 
2.          
T.C.
is a forty-five-year-old man.  On April 7, 2006, he was involuntarily committed
on a ninety-day order of non-hospitalization by the Bennington Family Court
after some of T.C.’s family members filed a petition.  The court did not issue
written findings of fact or conclusions of law, so the basis for the commitment
is not in the record.  The court revoked the non-hospitalization order
on May 5, 2006 and ordered T.C. to be hospitalized at VSH for the duration of
the commitment order.  At VSH, T.C. refused all psychiatric
medications.  

¶ 
3.          
On
May 30, 2006, the State filed a petition with the Washington Family Court
seeking an order for involuntary medication of T.C.  The court, Judge Toor
presiding, held a bench trial on June 9, 2006.  T.C.’s brother, his sister, and
his brother's fiancee testified for the State.  In addition, the State presented
the testimony of a second-year resident in psychiatry who had begun working
with T.C. one week before the hearing.  Craig Van Tuinen, M.D., a
board-certified psychiatrist with over fifteen years of experience who had
reviewed T.C.’s records and interviewed T.C. on two occasions, testified on
behalf of T.C.  

¶ 
4.          
The
psychiatry resident testified that T.C. was friendly and cooperative and that
he denied that there was anything wrong with him.  T.C. believed he was in the
hospital because  his family was conspiring against him and had put him there. 
The doctor noted that his initial impression had been that T.C. suffered from a
delusional disorder but that currently he was considering a diagnosis of
schizophrenia.  He testified that T.C. did not acknowledge any mental illness,
and thus, did not see the need for medication.  In addition, he refused the
drugs because he did not want to be “like a zombie.”

 







¶ 
5.          
The
family court found T.C. was mentally ill and that his mental illness had
manifested itself several years ago with strange behaviors, including his
belief that someone was taking pictures of him, manipulating the images and
publishing them.  He thought strangers were out to get him, and that there were
video cameras in some new furniture.  He once confronted a stranger with a
camera because he was sure she had taken pictures of him.  T.C.’s relationships
with members of his family deteriorated during this period as well.  He
expressed a belief that they were conspiring against him, and he had become
physically aggressive with his siblings.  

¶ 
6.          
The
court found that T.C. had not exhibited delusional thoughts since coming to VSH
but did not find this fact significant.  Nor did the court find Dr. Van
Tuinen’s testimony helpful, noting that “[Dr. Van Tuinen] does not believe that
[T.C.] has a mental illness, [but] that issue has already been addressed by the
earlier court’s finding that he is a patient in need of treatment.”  The family
court issued an involuntary medication order, and T.C. appealed.  

¶ 
7.          
On
July 3, 2006, the Commissioner of Health filed an application for continued
treatment, as the original commitment order expired after ninety days.  See 18
V.S.A. § 7620.  To succeed on an application for continued treatment, the
State must show, by clear and convincing evidence, that the patient is in need
of further treatment as defined by statute.  Id. §§ 7616(b), 7621(b),
(c), (e).  A “patient in need of treatment” is either:

(A) A person in need of treatment; or 

(B) A patient who is receiving adequate
treatment, and who, if such treatment is discontinued, presents a substantial
probability that in the near future his condition will deteriorate and he will
become a person in need of treatment.  

 

Id. § 7101(16).  A “person
in need of treatment,” in turn, is:







. . . a person who is suffering from
mental illness and, as a result of that mental illness, his capacity to
exercise self-control, judgment or discretion in the conduct of his affairs and
social relations is so lessened that he poses a danger to himself or others;

(A) A danger of harm to others may be
shown by establishing that: 

(i) he has inflicted or attempted to
inflict bodily harm on another; or

(ii) by his threats or actions he has
placed others in reasonable fear of physical harm to themselves; or

(iii) by his actions or inactions he has
presented a danger to persons in his care.

(B) A danger of harm to himself may be
shown by establishing that:

(i) he has threatened or attempted
suicide or serious bodily harm; or

(ii)
he has behaved in such a manner as to indicate that he is unable, without
supervision and the assistance of others, to satisfy his need for nourishment,
personal or medical care, shelter, or self-protection and safety, so that it is
probable that death, substantial physical bodily injury, serious mental
deterioration or serious physical debilitation or disease will ensue unless
adequate treatment is afforded.

Id. § 7101(17).

¶ 
8.          
The
State’s application for continued treatment was heard on August 11, 2006.  The
court, Judge Reiss presiding, took testimony from Dr. Gellman, a second-year
resident at VSH who had been working with T.C. for less than three weeks, and
again from Dr. Van Tuinen, who had, since the hearing on involuntary
medication, again met with T.C. for a forty-minute session.  No family members
testified.  Dr. Gellman testified that T.C. was able to discuss his daily
routine at the hospital and his life outside the hospital without exhibiting
any symptoms of delusional thought process.  He testified that T.C.’s illness
manifested itself in his refusal to accept his family’s version of events that
took place in 1999-2000, and that, when confronted with his family’s version of
events, he became angry.  







¶ 
9.          
Dr.
Van Tuinen testified that T.C. may have suffered from depression and substance
abuse in the past but that, during his admission to VSH, he had exhibited a
consistent mental status in which no thought disorder had been reported.  He
found no support for a diagnosis of schizophrenia.   He noted that there was “some
question about a disorder of perception.” [1] 
He noted that family members had reported significant delusions, and agreed
that T.C. may have suffered from a delusional disorder, but suggested that the
reported delusions all occurred in 1999-2000, when T.C. suffered from and was
treated for substance abuse.  The doctor opined that T.C.’s substance abuse may
have contributed to his delusions.  Dr. Van Tuinen further opined that T.C.’s
version of past events was not implausible.  He described a discordant family
relationship evidenced by police reports documenting assaults on T.C. by his
sister and her boyfriend.  He noted that all but one of the reports of T.C.’s
allegedly bizarre behavior come from family members and related to past
events.  Dr. Van Tuinen opined that T.C. did not, as of the hearing, present a
danger to himself or to others.  







¶ 
10.      
 The
family court found that the State had not met its burden to prove by clear and
convincing evidence that T.C. was a patient in need of further treatment.  The
court first noted that the State had not successfully demonstrated that T.C.
suffered from schizophrenia.  Based on Dr. Van Tuinen’s testimony, and the
testimony of staff who had observed T.C. while at VSH, the court found that the
criteria for schizophrenia were not satisfied in T.C.’s case: there was no
evidence of hallucinations; no disorganization in his speech, thought or
behavior; he was not noted to have a flat affect; he was engaged in social
relations on the unit and was friendly and cooperative.  The court further
found that the State had failed to prove by clear and convincing evidence that,
as a result of a mental illness, T.C. presented a continuing danger of harm to
himself or to others.  The family court dismissed the State’s application for
continued treatment and released T.C.  The State appeals.

¶ 
11.      
  The
State challenges the trial court’s refusal to afford preclusive effect to the
findings and conclusions of the prior medication order and the initial
commitment order.  The State also contends that the trial court erred in
construing the relevant statutes so narrowly that it refused to consider T.C.’s
dangerous behavior prior to his commitment and mental status during the period
of commitment as sufficient to meet its burden of proof under the “patient in
need of further treatment” evaluation.  18 V.S.A. § 7101(16).  Finally, the
State asserts that the trial court’s findings are clearly erroneous in some
respects.

¶ 
12.      
  This
Court reviews a trial court’s findings of fact in the light most favorable to
the prevailing party, “disregarding the effect of modifying evidence, and we
will not set them aside unless they are clearly erroneous.”  In re M.B.,
2004 VT 58, ¶ 6, 177 Vt. 481, 857 A.2d 772 (mem.).  We “uphold the court’s
conclusions if they are consistent with the controlling law and are supported
by the findings.”  In re Tekram Partners, 2005 VT 92, ¶ 7, 178 Vt. 628, 883 A.2d 1160 (mem.).  To determine whether a trial court’s conclusions of law are
“consistent with the applicable law” we “exercise plenary, nondeferential
review.”  Id.  A “trial court’s construction of [a] statute is a
question of law” and thus will be reviewed under the “nondeferential and
plenary” standard.  Hopkinton Scout Leaders Ass’n v. Town of Guilford, 2004 VT 2, ¶ 5, 176 Vt. 577, 844 A.2d 753 (mem.). 







¶ 
13.      
  The
State first objects to the trial court’s refusal to take judicial notice of the
facts found in the prior commitment and medication orders in this case, and its
refusal to give those orders preclusive effect.  Additionally, the State argues
that it should not be required to reprove, at each subsequent recommitment,
that the patient met commitment criteria at the time of the original
commitment.  The State misunderstands the burden imposed by the court below.  

¶ 
14.      
  “A
judicially noticed fact must be one not subject to reasonable dispute in that
it is either (1) generally known within the territorial jurisdiction of the
trial court or (2) capable of accurate and ready determination by resort to
sources whose accuracy cannot be reasonably questioned.”  V.R.E. 201(b).  A
court may take judicial notice, whether requested or not, but “shall take
judicial notice if requested by a party and supplied with the necessary
information.”  V.R.E. 201(c), (d).  The Reporter’s Notes recognize that “[n]either
the Rules of Evidence nor the Rules of Civil and Criminal Procedure expressly
cover judicial notice of the statutory and decisional law of Vermont,” noting
that “such matters are more properly viewed as matters which the judge is bound
to know by virtue of his office.”  Reporter’s Notes, V.R.E. 201.







¶ 
15.       The court correctly
held that the fact that the Bennington family court ordered hospitalization and
that the Washington family court ordered that T.C. be involuntarily medicated
were proper subjects of judicial notice.  The court in this case ruled that it
would not take judicial notice of the facts found in the involuntary medication
order, as that order was on appeal.   It further ruled that the content of
testimony given in a previous proceeding, when offered to bring in testimony
that was not before the court in the pending proceeding, was not an appropriate
subject of judicial notice, citing Jakab v. Jakab, 163 Vt. 575, 578, 664
A.2d 261, 263 (1995) (holding court could properly take judicial notice of the
fact of prior testimony, but could not use the content of that testimony as
evidence in the proceeding before it).  The State, however, argues that it did
not request the court to take judicial notice of testimony presented in the
earlier hearings, only of the findings of the courts in the two matters.  While
the State is understandably confused by the court’s choice of supporting case
law, the court went on to explain why judicial notice of the holdings of the
earlier order would not answer the question presented to it by the State’s
motion for continued treatment.

¶ 
16.      
 The
existence of a prior order is an appropriate subject of judicial notice.  Thus,
it can be judicially noted that, at the time the order of non-hospitalization
was issued, the court found that T.C. suffered from a mental illness, was a person
in need of treatment, and that a treatment program other than hospitalization
was adequate to meet his treatment needs, as required to support such an
order.  See 18 V.S.A. §§ 7101(17), 7617, 7618(a).  An order of
non-hospitalization may be amended to one of hospitalization when the patient
does not comply with the order, or when the alternative treatment has not been
adequate to meet the patient’s treatment needs.  Id. § 7618(b).  Based
on a transcript excerpt of the modification hearing, the non-hospitalization
order was apparently  amended due to T.C.’s failure to participate in the
counseling service programs ordered.  Thus, the court could take judicial
notice that, at the time of the order of hospitalization, T.C. was a person in
need of treatment and was hospitalized.  See Slade v. Slade, 2005 VT 39,
¶ 5, 178 Vt. 540, 872 A.2d 367 (mem.) (“Where findings are neither requested
nor made, this Court must assume that the trial court found every contested
issue of fact necessary to sustain the judgment.”).  However, without any
findings or conclusions of the committing court, only the statutory criteria
for issuance of an order of hospitalization were available for judicial
notice.  It can be assumed that the court’s statement that judicial notice
could be taken of the two prior orders is indicative that it did indeed
judicially notice the order of hospitalization as described above. 







¶ 
17.      
The
State argues that the reason given by the court for refusing to take judicial
notice of the findings of fact in the involuntary medication order, that the
order was on appeal, is also error.  Even if the rationale was error, an issue
we need  not decide here, the court did not err in declining to rely on the
findings contained therein.  The issues involved in an involuntary medication
order are not the same as those presented in an involuntary commitment order or
any subsequent order for continued treatment.  “Whereas involuntary commitment
ultimately depends on whether a person has mental illness and poses a danger of
harm to himself or others, involuntary medication depends on a person’s ability
to make decisions and appreciate their consequences. The facts underlying a
patient’s involuntary commitment cannot alone support involuntary medication.” 
In re L.A., 2006 VT 118, ¶ 14, ___ Vt. ___, 912 A.2d 977 (citations
omitted). 

¶  18.        Further, the State’s
attempt to rely on prior orders to satisfy its evidentiary burden for continued
treatment fails. The court properly held that neither the involuntary
medication order nor the order of hospitalization were entitled to preclusive
effect insofar as the State sought to rely on them to satisfy the essential
elements of its application for continued treatment.  Both the commitment and
involuntary medication proceedings were separate and distinct from the
continued treatment proceeding.  Each type of proceeding is governed by
different statutory procedures and legal standards.  See 18 V.S.A. §§ 7612,
7624, 7620.  The State distorts the statutory process by asserting that,
without according “preclusive effect to [the] earlier findings so as to prevent
collateral attack on the issue of whether the patient was properly committed in
the first instance” the court commits error.  The State fails to recognize its
burden at this stage. 







¶ 
19.      
 The
purpose of an application for continued treatment is to examine whether the
State can meet its burden of proving by clear and convincing evidence that a
patient who is involuntarily hospitalized continues to require
treatment.  18 V.S.A. §§ 7620(a), 7621; cf. In re G.K., 147 Vt. 174,
177-79, 514 A.2d 1031, 1032-34 (1986) (the State’s application is a
constitutionally required mechanism to review the status of persons subject to
involuntary treatment orders to determine whether continued treatment is
justified).  To evaluate whether a patient continues to require treatment, the
court must be convinced of the medical necessity for the treatment and the
adequacy and appropriateness of the proffered treatment for the mental illness
suffered.  This is the State’s burden to prove.  In re N.H., 168 Vt. 508, 511-12, 724 A.2d 467, 469 (1998).  In decisions based on a person’s mental status,
few things are static, and patients involuntarily committed to the state
hospital or found to be in need of further non-hospitalization treatment must
be afforded an opportunity to revisit the issue of commitment at least
annually.  18 V.S.A. § 7621(b), (c).  In resolving the dispute before it, the
court here properly considered current evidence of the patient’s mental health
in determining if T.C. was a patient in need of further treatment.  It did not,
as the State suggests, require the State to “reprove, at each subsequent
recommitment, that the patient met commitment criteria at the time of the
original commitment.”  The State was required to prove, by clear and convincing
evidence, the facts necessary to support a petition for continued treatment of
a person presently hospitalized, having been found at one time to be a person
in need of treatment. 







¶ 
20.      
  The
State’s argument on expert testimony fares no better.  The State argues that
the court should have disregarded testimony from T.C.’s expert to the extent it
was inconsistent with previous decisions and thus should have been barred by
the doctrine of issue preclusion.  Issue preclusion “bars the subsequent
relitigation of an issue that was actually litigated and decided in a prior
case where that issue was necessary to the resolution of the dispute.”  Scott
v. City of Newport, 2004 VT 64, ¶ 8, 177 Vt. 491, 857 A.2d 317 (mem.)
(quotation omitted).  However, the fact that Dr. Van Tuinen may have disagreed
with the medical evidence offered by the State at the initial hospitalization
hearing is of no moment.  His testimony at the hearing for continued treatment
was not offered to challenge the initial finding that T.C. suffered from a
mental illness at the time of his commitment.  As noted by the family court, “[t]he
passage of time may give rise to a new set of facts and expert opinions may change
over time.”  The court properly considered the evidence offered by Dr. Van
Tuinen on the issue of T.C.’s present mental-health status.  A patient’s
mental status is not frozen in time.  There was no error in the court’s
decision to consider Dr. Van Tuinen’s testimony. 

¶ 
21.      
 And,
while not a model of clarity, the court’s decision did not find that T.C. was
not mentally ill.  On the contrary, the court conceded that T.C. “may suffer
from a mental illness,” but went on to hold that the State had failed to prove
that he suffered from schizophrenia specifically.  It then went on to find that
the State failed to demonstrate by clear and convincing evidence that, “as a
result of a mental illness (whether [s]chizophrenia or some other mental
illness),” T.C. met the definition of a person in need of treatment as found in
18 V.S.A. § 7101(17).  (Internal quotation omitted.)







¶ 
22.      
  It
was perhaps the court’s reference to § 7101(17), the section that defines “a
person in need of treatment,” that caused the State to suggest that the court
forced it “to once again show by direct evidence that at the time of his
commitment, T.C. espoused bizarre delusions and as a result engaged in
threatening and assaultive behavior.”  (Emphasis added.)  However, the statute
defines “a patient in need of further treatment” as either a person in need of
treatment or a patient who is receiving treatment but whose condition would
probably deteriorate should treatment be discontinued.  Id. §
7101(16).   While the court’s ruling is a bit disjointed, the court did go on
to hold that the State failed to prove T.C. was a danger to himself or to
others and thus, “[b]ecause the State has not sustained its burden of
establishing by clear and convincing evidence that [T.C.] was a ‘patient in
need of further treatment’ at the time of the hearing, its application for
continued treatment must be dismissed.”  Thus, the trial court appropriately
analyzed both alternative definitions of “a patient in need of further
treatment” before coming to its conclusion.  

¶ 
23.      
  The
two prior orders shed light on T.C.’s history; however, they did not decide the
central question in the application for continued treatment: whether, at the
time of the hearing on the application for continued treatment, T.C. was a
patient in need of further treatment.  See People v. Munoz, 28 Cal.
Rptr. 3d 295, 301 (Cal. Ct. App. 2005) (holding that the “fact of a prior . . .
commitment does not change the fundamental issues to be litigated in extended
commitment proceedings”).  The fact that a person posed a threat of harm to
himself or others at the time of an original commitment hearing does not mean
he continues to pose the same threat months or years later.  The central
issue—the patient’s current mental status and need for further treatment—cannot
have been fully litigated in a prior proceeding.  Nor, it should be noted, is
it T.C.’s burden to show that his mental status has changed since the last
determination by a court that he was a person in need of treatment.  It was the
State’s burden to prove T.C. met the criteria for further treatment.  “Any
other result,” the court found, “would . . . obviate the State’s burden ‘of
establishing that there is a continuing need to strip the citizen of one of his
most cherished rights.’ “ In re G.K., 147 Vt. at 178, 514 A.2d at 1033. 
We agree.  It would have been error for the trial court to give preclusive
effect to the findings from earlier proceedings to determine the issue before
it.







¶ 
24.      
The
State next argues that the trial court erred in refusing to consider T.C.’s
dangerous behavior prior to commitment.  As noted, the State did not present
evidence of T.C.’s earlier behavior, deciding to rely on the findings of fact
made in prior orders concerning T.C.’s behavior.  It is true that a patient’s
history of violence may be taken into consideration in reviewing an application
for continued treatment.  In re E.T., 2004 VT 111, ¶ 15, 177 Vt. 405, 865 A.2d 416.  However, in E.T. we stated, “[i]t is not just E.T.’s history
that guided the court here, but rather the combination of that history and the present
likelihood that he will rapidly deteriorate and become violent if he stops
taking his medication.”  Id. (emphasis added).  Thus, while the patient’s
mental state at the time of an initial commitment hearing may assist the court
in evaluating his current mental state, the State’s burden of proof requires
more than simply submitting the original commitment order and asserting that
nothing has changed.  See, e.g., In re M.C., 2005 VT 60, ¶¶ 5-6, 178 Vt. 585, 878 A.2d 284 (mem.) (granting application for continued treatment where State’s
psychiatrist testified that patient’s delusions and hallucinations persisted
despite regular medication and patient was unable to perform basic daily tasks
or take care of himself).  In E.T., for example, the patient had a
documented history of  rapid mental decline triggered by his missing even one
dose of medication.  E.T., 2004 VT 111, ¶ 2.  In this case, the State’s
witness conceded that T.C. was unmedicated and still had not exhibited any
threatening or aggressive behavior during the time he was in the hospital.  The
witness was concerned that T.C.’s behavior would change once he was released
from the hospital due to his lack of insight into his mental illness.  However,
it is clear that the court did not credit that testimony.  The court noted
that, since his admission to VSH, T.C. had exhibited no signs that he was a
danger to others, and that he had not assaulted, attempted to assault, or verbally
or physically threatened any other person during an extended period of close
observation.  The court concluded that the State had failed to establish by
clear and convincing evidence that as a result of his mental illness, T.C.
presented a continuing danger of harm to others.   That is, the State did not
show that if treatment was discontinued, T.C. would “present[] a substantial
probability that in the near future his condition will deteriorate and he will
become a person in need of treatment.”  18 V.S.A. § 7101(16).  While the court
apparently did not rely on the evidence of dangerousness found by the court in
the earlier orders, its reasoning is still sustainable.  Relying on earlier
evidence of his aggressive and dangerous behaviors prior to commitment would
not have met the State’s burden to prove that, without continuing treatment,
T.C. presented a continuing danger of harm to himself or others.  The court so
found.  While the evidence presented at the involuntary medication
hearing included reported incidents of physical aggression that took place
three or four months earlier, the court reasoned, that “[i]f such facts were
held to preclude a re-examination of whether because of his mental illness,
[T.C.] continues to present a danger of harms to others, he would never be
released.”  

¶ 
25.      
  The
State claims that the trial court erred in making certain factual findings.  In
particular, the State objects to the trial court’s finding that the State’s
witness had diagnosed T.C. with schizophrenia to the exclusion of other
disorders.  It also objects to the finding that T.C.’s only delusion was the
entrenched belief that his family is incorrect about a series of events that
took place some time ago.  Finally, it finds error in the court’s reliance on
Dr. Van Tuinen’s testimony to a greater extent than Dr. Gellman’s testimony. 
The family court’s findings of fact will stand on review “unless, taking the
evidence in the light most favorable to the prevailing party, and excluding the
effect of modifying evidence, there is no reasonable or credible evidence to
support them.”  Creed v. Clogston, 2004 VT 34, ¶ 18, 176 Vt. 436, 852 A.2d 577; V.R.C.P. 52(a).  







¶ 
26.      
  What
the State fails to accept is that the trial court gave little weight to the
testimony of the second-year resident due to his minimal exposure to the
practice of psychiatry: six months of in-patient psychiatry while in medical
school and a one-month rotation in public psychiatry in which he was currently
engaged.  The court ultimately concluded that “Dr. Gellman’s expert opinion
does not rise to the level of clear and convincing evidence.”  The factfinder
is best situated to weigh evidence, and therefore, is entitled to weigh the
testimony of the two experts, consider their respective expertise and give
whatever weight it believes proper to the testimony of the witnesses
presented.  In re N.H., 168 Vt. at 514, 724 A.2d at 471.

¶ 
27.      
  Nor
was it error for the court to rely on the testimony of Dr. Van Tuinen and his
conclusions about family dynamics for purposes of assessing the T.C.’s version
of past events.  Dr. Van Tuinen’s description of family dynamics in general was
certainly within his realm of expertise, and it was the kind of information
that the court could use in evaluating the relative weight to give to the
expert testimony.  The State, however, objects to the court’s statement that “Dr.
Van Tuinen further opined that [T.C]’s version of past events is not
implausible.”  The court did not adopt this conclusion as its own.  Rather, it
contrasted this conclusion with Dr. Gellman’s opinion that T.C’s version of
past events currently qualifies as a delusion.  These two statements are
exactly the type of conflicting expert testimony that a fact-finder is
particularly suited to adjudicate.







¶ 
28.      
  This
Court has long recognized that confinement for compulsory psychological
treatment represents a “ ‘massive curtailment of liberty’ “ necessitating a
heightened standard of proof.  See In re W.H., 144 Vt. 595, 597, 481
A.2d 22, 24 (1984) (quoting Humphrey v. Cady, 405 U.S. 504, 509 (1972)).  When dealing with a citizen’s liberty in connection with a subject
as mercurial as mental illness, the State must prove its case by clear and
convincing evidence—the high burden of proof imposed by the legislature.  18
V.S.A. § 7616(b).  As we noted in N.H.,”[g]iven the significant
deprivation of liberty that results from an order of continued treatment, the
clear-and-convincing evidence standard should operate as a fundamental caution
upon the minds of all judges, barring such orders unless the evidence results
in a firm conviction as to the truth of the allegations to be established.” 
168 Vt. at 512, 724 A.2d at 470.   Here, the court correctly found that the
State failed to meet that burden.  Because we affirm the court’s denial of
continued treatment, the appeal of the involuntary medication order is moot.  

Docket number 2006-402
is affirmed.  Docket number 2006-293 is dismissed as moot. 

 

FOR THE COURT:

 

 

 

_______________________________________

Associate Justice

 





[1] “ ‘Mental illness’ ” means a substantial
disorder of thought, mood, perception, orientation, or memory, any of which
grossly impairs judgment, behavior, capacity to recognize reality, or ability
to meet the ordinary demands of life . . . .” 18 V.S.A. §
7101(14).