2015 VT 55











In re T.S.S. (2014-206)

 

2015 VT 55

 

[Filed 10-Apr-2015]

 

NOTICE:  This opinion is
subject to motions for reargument under V.R.A.P. 40 as well as formal revision
before publication in the Vermont Reports.  Readers are requested to
notify the Reporter of Decisions by email at: JUD.Reporter@state.vt.us or by
mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont
05609-0801, of any errors in order that corrections may be made before this
opinion goes to press.

 

 


 
 
 2015 VT 55
 
 


 


 
 
 No. 2014-206
 
 


 


 
 
 In re T.S.S.
 
 
 Supreme Court
 
 
 
 
  
 
 
  
 
 
 
 
  
 
 
 On Appeal from
 
 
 
 
  
 
 
 Superior Court, Rutland Unit,
 
 
 
 
  
 
 
 Family Division
 
 
 
 
  
 
 
  
 
 
 
 
  
 
 
 March Term, 2015
 
 
 
 
  
 
 
  
 
 
 
 
  
 
 
  
 
 
 
 
 Cortland
 Corsones, J.
 
 
 
 
  
 
 


John J. McCullough III, Vermont Legal Aid, Inc., Montpelier,
for Petitioner-Appellant.

 

William H. Sorrell, Attorney General, and Philip Back,
Assistant Attorney General, Montpelier,

  For Respondent-Appellee.

 

 

PRESENT:    Reiber, C.J., Dooley, Skoglund,
Robinson and Eaton, JJ.

 

 

¶ 1.            
ROBINSON, J.   Respondent T.S.S. appeals from a
decision of the Superior Court, Family Division, granting the commissioner of
the Department of Mental Health’s application for a continued order of
non-hospitalization (ONH) compelling T.S.S. to continue undergoing
mental-health treatment.  T.S.S. argues that the superior court erred in
interpreting 18 V.S.A. § 7101(16) and applying it to the evidence. 
We agree and vacate the ONH.

¶ 2.            
The following facts, taken in the light most favorable to the State as
the prevailing party, are drawn from the superior court’s findings and the
evidence presented at the April 2014 hearing on the commissioner’s petition for
continued treatment.  T.S.S. is a thirty-four-year-old man who lives in
Rutland.  Since 2000, he has received treatment at Rutland Mental Health
Services (RMHS).  The commissioner presented two witnesses at the hearing:
Caitlyn Frazier of the Vermont Department of Mental Health, and Evelyn Susan Gerretson,
M.D., a psychiatrist and medical director at RMHS.  Ms. Frazier is
T.S.S.’s case manager, and since 2011 has met with him about every other
week.  Dr. Gerretson has known T.S.S. for more than a decade and has been
his treating psychiatrist since around 2006.  She sees T.S.S. about once a
month.

¶ 3.            
Dr. Gerretson testified that T.S.S. suffers from paranoid schizophrenia,
a thought disorder characterized by hallucinations, delusions, and
deterioration in functioning.  When his condition is left untreated,
T.S.S. experiences these symptoms.  Dr. Gerretson testified that T.S.S.
“has demonstrated a clear pattern that for a short period of time, despite
denying that he has a mental illness, he, on orders of non-hospitalization,
will take medications and improve significantly.  But when he is off the
order of non-hospitalization, he quickly goes off medications and
deteriorates.”  T.S.S. is being appropriately treated under his current
regimen.  He has taken various antipsychotic drugs, initially orally and
now by injection.  The medication makes T.S.S. less irritable and more
organized, although Dr. Gerretson testified to some concerns about his
judgment.

¶ 4.            
Dr. Gerretson testified that if T.S.S. ended his course of treatment,
his prognosis would be “poor”; it would be “very probable that he would revert
back to the prior condition of being disorganized, paranoid, and very labial,
and revert to past behavior”; and his mental condition would deteriorate within
a year.  Dr. Gerretson did not testify about whether or when T.S.S’s
condition would deteriorate to a point where he would become a person in need
of treatment—that is, a person whose “capacity to exercise self-control,
judgment, or discretion in the conduct of his or her affairs and social
relations is so lessened that he or she poses a danger of harm to himself, to
herself, or to others.”  18 V.S.A. § 7101(17).  Dr. Gerretson
testified: “I cannot predict the timing because there was a four-year
. . . [or] three-year period that he was off orders.”

¶ 5.            
Over the fifteen-year history testified to at the hearing, there was no
evidence that T.S.S. exhibited assaultive behavior or posed a danger to
others.  There was evidence, however, that at times T.S.S. posed a danger
to himself.  In 1999, T.S.S.’s symptoms first appeared; he became “very
paranoid, sometimes agitated, breaking glass” and at one point harmed himself
while suffering a delusion that there was a transmitter in his arm.
 T.S.S. was treated at Vermont State Hospital and was released on an ONH
in 2000.  In 2002, the commissioner filed an application for continued
treatment, which the superior court denied in August of that year.  After
being released from the ONH, T.S.S.—whom Dr. Gerretson described as a “talented
musician”—traveled to California and worked as a drummer in a band. 
T.S.S. later returned to his parents’ home in Vermont.

¶ 6.            
After returning to Vermont, T.S.S. suffered various delusions, including
that his father was the head of a large drug cartel and exerted control over
the government and that his food was poisoned.  He held conversations with
a picture of his deceased grandfather whom he claimed was “the ruler of the
world,” suffered from fits of rage, and appeared emaciated.  T.S.S.’s
parents filed for an emergency evaluation, see 18 V.S.A. § 7504, and
T.S.S. was hospitalized at Rutland Regional Medical Center.  In November
2003, T.S.S. was released from the hospital on a stipulated ONH.  It was
around this time that T.S.S. first met Dr. Gerretson.  In September 2004,
the superior court granted the commissioner’s application for continued
treatment.

¶ 7.            
Evidence of T.S.S.’s condition over the eight-year period from 2004 to
2012 is sparse.  In 2008, RMHS decided not to seek renewal of the
ONH.  From late 2008 until 2012, T.S.S. was not under any compulsory
treatment, and was not receiving any services.  The record does not
indicate why RMHS did not seek renewal of the ONH; nor does it address T.S.S.’s
condition in 2008 or over the next four years.  In August 2011, T.S.S. was
charged with unlawful mischief greater than $250, a misdemeanor.  13
V.S.A. § 3701(b).  At the hearing, Dr. Gerretson testified that she
had only “limited information” on the circumstances surrounding the charge.[1]  Following an outpatient evaluation
and competency hearing, the court found on March 2012 that T.S.S. was not
competent to stand trial.  In August 2012, T.S.S. and the State stipulated
to the issuance of an ONH in return for dismissal of the charge.

¶ 8.            
In June 2013, the commissioner filed an application for continued
treatment.  T.S.S. did not contest the application and stipulated to entry
of the order.  Ms. Frazier testified that at some point staff saw T.S.S.
in distress, “yelling and kind of gesticulating” in the parking lot before
entering the RMHS office, but that these behaviors diminished after adopting a
new medication in September 2013.  In February 2014, the commissioner
filed an application for continued treatment for an additional year. 
T.S.S. opposed that application, leading to this appeal.

¶ 9.            
Evidence concerning T.S.S.’s current (rather than past) mental state and
conduct was limited.[2] 
In 2014, at the time the hearing took place, there was no evidence that T.S.S.
had any food-related issues, and Dr. Gerretson testified that he did not appear
emaciated.  Both witnesses testified that T.S.S. “does not appreciate
being on orders,” and that “[h]e does not believe that he has a mental illness
and that he needs treatment.”  T.S.S. also dislikes the side effects of
some of his medications.  Ms. Frazier testified that T.S.S.’s hopes to
visit France once his ONH lapses do not seem realistic given his limited
resources.  Dr. Gerretson also testified that she and her staff saw T.S.S.
bicycling in the middle of the street, although not during high-traffic
periods.

¶ 10.         On
May 27, 2014, the superior court granted the commissioner’s application. 
The court concluded:

[I]t
is clear to the court that if [T.S.S.’s] current treatment is terminated, eventually,
[he] will become a person in need of treatment.  This has been his pattern
over the last ~15 years.  There is a substantial probability that
this will happen.  It is unknown when it will happen.  According to
Dr. Gerretson, whom the court finds credible, [T.S.S.’s] condition will decline
in 6 months to 1 year.  It is unknown when it will deteriorate to the
point wherein [T.S.S.] will be “a person in need of treatment.”  It is the
nature of his particular mental illness that such predictions are very
difficult.  However, he will reach that point.

 

. . . .

 

 
. . . The court concurs with the State’s parsing of the phrase in 18
V.S.A. § 7101(16) “that in the near future his or her condition will
deteriorate and he or she will become a person in need of treatment.”
. . . [T]he phrase “near future” references when the condition will
deteriorate and not necessarily when the patient will become a person in need
of treatment.  The intent of the phraseology is met if [T.S.S.’s]
condition will deteriorate in the near future and this will inexorably result
in him becoming a “person in need of treatment.”  It is not necessary that
the State prove that [T.S.S.] will become a “person in need of treatment” in
the near future as long as his condition will deteriorate in the near future
and this will inevitably lead to him becoming a “person in need of treatment.”

 

T.S.S. appealed.

 

¶ 11.         On appeal,
T.S.S. makes two arguments.  First, T.S.S. argues that the superior court
erred in construing 18 V.S.A. § 7101(16) to provide that a person is “a
patient in need of further treatment” if his or her condition would likely
deteriorate in the near future if treatment were discontinued, without regard
to whether it would deteriorate to the point where the patient poses a danger
to himself, herself, or others within the near future.  Second, T.S.S.
argues that the superior court’s determination is unsupported by the evidence.

I.  Interpretation
of 18 V.S.A. § 7101(16)

 

¶ 12.         We
first address T.S.S.’s statutory argument.  “No person may be made subject
to involuntary treatment unless he or she is found to be a person in need of
treatment or a patient in need of further treatment.”  18 V.S.A. § 7611.
 In proceedings for involuntary treatment on either basis, the state has
“the burden of proving its case by clear and convincing evidence.”  Id.
§§ 7616(b), 7621(a).  If the superior court finds that the proposed
patient was a person in need of treatment at the time the application of
treatment was made by the commissioner and was a patient in need of further
treatment at the time of the hearing, the court may order the person to undergo
appropriate inpatient or outpatient treatment for a specified time
period.  Id. § 7617(b).  “If, prior to the expiration of
[such an order], the commissioner believes that . . . the patient
continues to require treatment, the commissioner shall apply to the court for a
determination that the patient is a patient in need of further treatment and
for an order of continued treatment,” stating the basis for the determination
that the patient is in need of further treatment.  Id.
§ 7620(a), (b).  A hearing on the application for continuing
treatment is held in accordance with the same procedures used for an
application for compulsory treatment in the first instance.  Id.
§ 7621(a).  “If the court finds that the patient is a patient in need
of further treatment but does not require hospitalization, it shall order
nonhospitalization for up to one year.”  Id. § 7621(c).

¶ 13.         A
“patient in need of further treatment”  is defined as:

 
(A) A person in need of treatment; or 

 

  (B)
A patient who is receiving adequate treatment, and who, if such treatment is
discontinued, presents a substantial probability that in the near future his or
her condition will deteriorate and he or she will become a person in need of
treatment.

 

Id.
§ 7101(16).  In turn, a “person in need of treatment” is defined in
relevant part as

a person who has a
mental illness and, as a result of that mental illness, his or her capacity to
exercise self-control, judgment, or discretion in the conduct of his or her
affairs and social relations is so lessened that he or she poses a danger of
harm to himself, to herself, or to others[.] . . . A
danger of harm to himself or herself may be shown by establishing that:

 

 
(i) he or she has threatened or attempted suicide or serious bodily harm; or 

 

  (ii) he or
she has behaved in such a manner as to indicate that he or she is unable,
without supervision and the assistance of others, to satisfy his or her need
for nourishment, personal or medical care, shelter, or self-protection and
safety, so that it is probable that death, substantial physical bodily injury,
serious mental deterioration, or serious physical debilitation or disease will
ensue unless adequate treatment is afforded. 

 

Id.
§ 7101(17)(B).

¶ 14.         T.S.S.
argues that the superior court erred in concluding that the “in the near
future” requirement in 18 V.S.A. § 7101(16) only applies to the deterioration
in condition, and not also to actually “becom[ing] a person in need of
treatment.”  The superior court concluded that a substantial probability
that a person would become a person in need of treatment at any time in the
future would be sufficient to meet the requirements of the “will become a
person in need of treatment” language of § 7101(16), even if that point
would only come years later.  T.S.S., by contrast, argues that
§ 7101(16) is properly read to require that both the anticipated
deterioration in a patient’s condition and the becoming of a person in need of
treatment are substantially likely to occur “in the near future.”

¶ 15.         The
meaning of § 7101(16) is an issue of statutory interpretation, which we
consider de novo.  In re M.B., 2004 VT 58, ¶ 6, 177 Vt. 481,
857 A.2d 772 (mem.).  “In construing a statute,
our principal goal is to effectuate the intent of the Legislature.”  State
v. LeBlanc, 171 Vt. 88, 91, 759 A.2d 991, 993 (2000) (quotation omitted).
 In doing so, our starting point is the text of the statute, because “we
presume that all language in a statute was drafted advisedly, and that the
plain ordinary meaning of the language used was intended.”  Id.
(quotation omitted).  In construing statutes, we also “consider the
purpose of the statute and look to the broad subject matter of the law, its
effects and consequences, and the reason and spirit of the law.”  Merkel
v. Nationwide Ins. Co., 166 Vt. 311, 314, 693 A.2d 706, 707-08 (1997)
(quotation omitted).

¶ 16.         Construing
the plain language of § 7101(16) as well as its purpose and effect, we
hold that the phrase “a substantial probability that in the near future his or
her condition will deteriorate and he or she will become a person in need of
treatment” means that the State must show, by clear and convincing evidence,
that if treatment is discontinued, there is a substantial probability that in
the near future the person’s condition will deteriorate and in the near
future the person will become a person in need of treatment.

¶ 17.         Several
factors influence our conclusion.  First, the statute’s “use of the word
‘and’ indicates an intent for the phrases to be conjuctive; therefore it is
necessary to comply with both requirements to meet the definition.”  In
re Request for Jurisdictional Opinion (F-35A Case), 2015 VT 41,
¶ 15, ___ Vt. ___, ___ A.3d ___.  The construction urged by the State
would essentially read out of the statute the language relating to “becom[ing]
a person in need of treatment” in “the near future.”  See Payea v.
Howard Bank, 164 Vt. 106, 107, 663 A.2d 937, 938 (1995) (“We will not
construe a statute in a way that renders a significant part of it pure
surplusage.” (quotation omitted)).

¶ 18.        
Second, the statute’s purpose is not to prevent individuals from
mental deterioration in the near future.  Rather, it is to prevent persons
from “pos[ing] a danger of harm to [themselves] or to others.”  18 V.S.A.
§ 7101(17).  It goes without saying that all persons—those receiving
adequate treatment, those in need of treatment, and those with no illness
requiring treatment—suffer occasional “deterioration” in mental
condition.  Such deterioration may be a precursor to becoming a person in
need of treatment, but it might also be a normal reaction to life events, or a
temporary setback in the course of an ongoing illness.  The Legislature’s
inclusion of the requirement that the person, if left untreated, would become a
person in need of treatment in the near future reflects an intent to prevent
persons from posing a danger of physical harm to themselves or to others. 
Put simply, the legislative scheme evinces a concern not with deterioration in
itself, but with the consequences of the deterioration—the patient’s becoming a
person in need of treatment.  The statutory scheme does not authorize
involuntary treatment of a person in need of treatment in the first instance
based on a finding that he or she may at some point in the future become a
danger to himself, herself, or others.  Given this, it would be odd to
allow continued involuntary treatment of an individual based solely on a
finding that he or she was likely to pose a danger in the distant future.
 See Heffernan v. Harbeson, 2004 VT 98, ¶ 7, 177 Vt. 239, 861
A.2d 1149 (noting that in resolving any “doubt or
ambiguity” in statute, “we discern legislative intent by considering the statute as a whole, reading integral parts of the statutory scheme together”).

¶ 19.         Third, our review of the legislative history underlying this
statute reinforces this understanding.  See Perry v. Med. Practice Bd.,
169 Vt. 399, 406, 737 A.2d 900, 905 (1999) (noting that “legislative history
and circumstances surrounding [a statute’s] enactment, and the legislative
policy it was designed to implement,” may be helpful in discerning legislative
intent).  The Legislature established Vermont’s modern statutory scheme
governing compulsory mental-health treatment in 1978.  1977, No. 252 (Adj.
Sess.).  The definitions of “person in need of further treatment”
and “person in need of treatment” remain in effect today, and have never been
substantively amended.  18 V.S.A. § 7101(16), (17).[3]

¶ 20.        
The Senate Health and Welfare Committee heard testimony from two
witnesses during its hearings on this bill on March 8 and 30, 1977.[4]  We
recognize the perils of discerning legislative intent on the basis of statements
of individual witnesses in committee hearings, but in this case we conclude
that the key witnesses’ statements are instructive.  The only two
witnesses who testified before the Senate committee expressed a common
understanding, even though they represented different stakeholders—the
Department of Mental Health and Vermont Legal Aid—with disparate
perspectives.  See In re Hinsdale Farm, 2004 VT 72,
¶ 17, 177 Vt. 115, 858 A.2d 249 (“While we have stated that testimony and
statements of legislative witnesses and individual legislators can be
‘inconclusive at best,’ we cite the committee testimony
and legislators’ discussions here because they convincingly illustrate
. . . the Legislature[’s] intent.” (quoting Vt. Dev. Credit Corp.
v. Kitchel, 149 Vt. 421, 428, 544 A.2d 1165, 1169 (1988)).

¶ 21.         During
both committee hearings, testimony was given by Peter Bluhm, an assistant
attorney general assigned to the Department of Mental Health who was closely
involved in drafting the legislation.  Mr. Bluhm stated that the
legislation was the result of collaboration between “a broad cross-section” of
interested parties—including mental-health agencies, legal aid organizations,
and citizens’ groups—who had formulated a compromise bill over two years. 
Mar. 8 Hr’g Tr. at 5.  He explained that the legislation was to be a replacement for
the then-existing legislative scheme, which had “some constitutional
infirmities.”  Id. at 7; see also Mar. 30 Hr’g Tr. at 54 (statement
of Mr. Bluhm that bill is intended to make standards
“more constitutionally acceptable”).  He explained, for example,
that the then-existing law “allows for commitments of
people who are mentally ill and lacking in insight, concerning their need for
treatment,” which Mr. Bluhm noted “has been
held by a couple of courts to be unconstitutional.”  Mar. 8 Hr’g Tr. at
9.  The enactment of S. 103 was designed to rectify these infirmities and
avoid the “disaster . . . [of] having major parts of our
mental-health law declared unconstitutional and then trying to operate a
mental-health system without a statute.”  Id.  Mr.
Bluhm explained that in conformance with “all the newer constitutional
standards that have been pronounced by courts all across the
country . . . S. 103 allows commitment only if the person is
considered dangerous to himself or to others.”  Id.  Mr. Bluhm noted that
S. 103 “is narrowing the class of people” subject to court-ordered
treatment, so that only persons who are dangerous to themselves or others—not
the “harmlessly irrational”—are subject to compulsory treatment.  Mar. 30
Hr’g Tr. at 56-57.[5]

¶ 22.         Mr.
Bluhm testified on the meaning of the “key terms in this bill”—the definitions
of “patient in need of further treatment” in § 7101(16) and “person in
need of treatment” in § 7101(17).  Mar. 8
Hr’g Tr. at 26, 49, 134.  He explained:

Paragraph
16 defines a patient in need of treatment . . . .  You can
see that the bill includes specific comments as to what amounts to a risk of
injury to self or risk of injury to others.  It does not include any
property offenses.  It does not include any nuisance-type activities.

 

Id. at 28.

¶ 23.         A
committee member later had the following colloquy with the other witness,
William Dalton, who represented Vermont Legal Aid:

Sen.
Niquette:  The reason for that definition [in § 7101(16) and
§ 7101(17)] is to show that he is going to be a danger
. . . .

 

Mr.
Dalton: Ultimately, yes, a few weeks down the road. . . . [Y]ou can
get them before it gets to be that kind of condition.

 

Sen.
Niquette: If he’s going to starve, in other words.

 

Mr. Dalton: Because the mental health field is
tremendously concerned that they can see someone who is really starting to go
downhill rapidly, and if they can do something now, they think they can
help.  Two or three weeks from now, they represent they can’t.  I
have some serious reservations about that, but this, like all pieces of
legislation, is a compromise and that is as stringent and concise a definition
as we could come up with, that would satisfy most of the situations.  It
is clear that some people are going to slip through the cracks.

 

Id. at
60-61.  This legislative history suggests that the Legislature likely
understood “near future” to apply to both deterioration and
dangerousness.  For the reasons noted above, we do not assume that this
one witness’s assessment of how imminent the danger must be before a person
qualifies as “in need of treatment” reflects the Legislature’s intended
understanding of the meaning of “the near future.”  Nor do we rest our
decision in this case solely or even primarily on this legislative
history.  But we do conclude that the overall legislative history provides
further support for our view that the Legislature did not intend to authorize
continued involuntary treatment based on potential dangerousness at some
undefined time in the future.

¶ 24.        
Fourth, we have previously emphasized the imminence of
deterioration, and the resultant danger to self or others, as
significant.  In In re E.T., we approved of the issuance of an ONH
to a person suffering from paranoid schizophrenia where experts for both
parties agreed that there was a “present likelihood that [respondent] will rapidly
deteriorate and become violent if he stops taking his medication” and that “if
E.T. were to discontinue treatment, as he has on several occasions, the
likelihood of rapid decompensation and resultant public danger is high.” 
2004 VT 111, ¶¶ 14-15, 177 Vt. 405, 865 A.2d 416 (emphasis added). 
Similarly, in In re M.C., we affirmed an ONH because the respondent had
attempted to kill his brother in the past, the expert testimony was that the
respondent was “just as dangerous as he ever was,” and the court made a
specific finding that “the ONH was the least restrictive means of providing
. . . treatment and protecting the public.”  2005 VT 60,
¶¶ 1-2, 5, 7, 178 Vt. 585, 878 A.2d 284 (mem.) (quotation marks
omitted).  See also Conservatorship of Murphy,
184 Cal. Rptr. 363, 365 (Cal. Ct. App. 1982) (finding expert testimony
that ward, an alcoholic, “was gravely disabled . . . based upon a
‘likelihood’ that if he were released he would at some future time return to
the use of alcohol” to be insufficient to show that he “was ‘presently’ gravely
disabled”); State v. J.G., 180
P.3d 63, 65 (Or. Ct. App. 2008) (finding
“conclusion that appellant is a danger to herself
because . . . at some unknown point
in the future” she might be
harmed to be “unduly speculative” and
insufficient to “establish, by clear and convincing evidence, that appellant is
a danger to herself”).

¶ 25.         Finally,
we construe statutes so as to avoid constitutional difficulties, if
possible.  State v. Cantrell, 151 Vt. 130, 134, 558 A.2d 639, 642
(1989).  As we have recognized, “orders of
nonhospitalization implicate important liberty interests requiring due process
protections.”  In re G.K., 147 Vt. 174, 176, 514 A.2d 1031, 1032
(1986).  The ONH here requires respondent to “keep all appointments as set
with, or by” RMHS; “take all medications in form and dosage . . . as
prescribed . . . and take medications in front of RMHS, if
requested”; and “follow the treatment plan” as set by RMHS.  It is “beyond
dispute” that such restrictions clearly impinge upon an individual’s “right to
unrestricted travel, and . . . right to be free from unwarranted
intrusions of one’s bodily integrity.”  Id. at 176-78, 514 A.2d at
1032-33 (noting that Vermont Constitution mandates presumption that “people are born free and enjoy freedom from restraint as a
natural, inherent and unalienable right” (quoting Vt. Const. ch. I, art.
1)).  “[P]ersons subject to
nonhospitalization orders are entitled to the same due process protections as
persons subject to commitment orders insofar as the right to periodic
review of their mental health status is concerned.”  Id. at 176,
514 A.2d at 1032.

¶ 26.         If we
were to adopt the construction of § 7101(16) that the State urges,
allowing a finding that the person is likely to become a person in need of
treatment at some point in the future (however distant) to support a continued
ONH, it would present serious constitutional concerns.  As we have held, “[i]n decisions based on a person’s mental status, few
things are static.”  In re T.C.,
2007 VT 115, ¶ 19, 182 Vt. 467, 477, 940 A.2d 706.  That a person
could or will “eventually” become a person in need of treatment is, standing
alone, a thin reed upon which to predicate a continued intrusion upon
fundamental liberty.  See also In re Mental Health of A.S.B.,
2008 MT 82, ¶¶ 38-46, 180 P.3d 625 (Gray, C.J., dissenting) (dissenting
from court’s failure to consider constitutionality of “deterioration standard”
purporting to allow involuntary commitment based on mere possibility that
individual’s condition may worsen to point where individual would pose threat
of harm to self or others, and expressing view that “it is unconstitutional to
involuntarily commit a mentally ill person on the basis of a mental disorder
which will, ‘if untreated, predictably result in deterioration’ . . .
to the point that the person becomes a danger to self or others or unable to
provide for basic needs,” because “[p]eople—mentally ill or otherwise—generally
have a right to be left alone unless they are an imminent danger to those
around them or are committing a criminal offense”).

¶ 27.         We
recognize the difficult and sensitive nature of cases such as this one. 
Mental health professionals, family members, and judges are all rightfully
concerned with the welfare of individuals suffering from serious psychiatric
disorders.  It is undisputed that T.S.S.’s care-providers sought a
continued ONH because they are concerned for his well-being and want to protect
him from making a choice that would lead him, eventually, to become a danger to
himself.  We also recognize that the State does not have “to wait until [a
person] actually becomes dangerous to intervene,” and remain on guard against
“a  ‘revolving door’ syndrome characterized by recurring commitments,
medication, rejection of medication, and crisis intervention,” which we have
warned against.  In re P.S., 167 Vt. 63, 74, 702 A.2d 98, 105
(1997).  But the fact is, people who do not pose an imminent danger to
themselves or others have a right to autonomy that includes the right to make
decisions about the most personal of matters, even if those decisions are
deemed by others to be profoundly ill-advised.  Our interpretation of
§ 7101(16) is most consonant with the statute’s text and purposes and best
balances the constitutional rights of individuals with the State’s valid
interest in protecting individuals and the public.  See In re Torski C.,
918 N.E.2d 1218, 1232 (Ill. App. Ct. 2009) (“The threshold must be narrowly
tailored to ensure the commitment of only those individuals who are considered
dangerous, yet broad enough to ensure that [a person] who desperately need[s]
treatment can get it before his or her condition becomes significantly worse
and treatment may be less successful.”).

II.  Findings and Evidence

 

¶ 28.         We
next turn to whether the evidence was sufficient to support the superior
court’s findings, and whether the findings were sufficient to support the
court’s legal conclusion.  We accept the superior court’s factual findings
unless they are clearly erroneous; that is, unless there is no “reasonable and
credible evidence to support them.”  M.B., 2004 VT 58, ¶ 6.

¶ 29.         The
court found that if T.S.S. terminated his treatment, his condition would
deteriorate in six months to one year.  The court also found that T.S.S.
would “eventually” become a person in need of treatment, noting that “[t]his
has been his pattern over the last ~15 years.”  However, the court
explained that “[i]t is unknown when [T.S.S.’s condition] will deteriorate to
the point wherein he will be ‘a person in need of treatment.’ ”

¶ 30.         This
finding, which is the most that the superior court could make based on the
evidence presented, is insufficient to meet the statutory requirement that the
court find that T.S.S. is likely to become a person in need of treatment “in
the near future.”  An individual’s pattern of rapid deterioration and
return to the status of person in need of services following the termination of
an ONH may provide evidence that there is a substantial probability that the
person will become a person in need of services in the near future if an ONH is
discontinued.  In determining the weight to assign such a pattern, a court
should consider, among other factors, the frequency of the pattern; the recency
of the pattern; the speed at which the person’s condition has deteriorated to
the point that he or she becomes a person in need of supervision; and expert
testimony concerning the likelihood that the pattern will repeat.

¶ 31.         In this
case, the superior court’s references to T.S.S.’s pattern over the last fifteen
years cannot support a continued ONH, given the record evidence of that
pattern.  The question in this case is whether T.S.S. is likely to pose a
danger to himself in the near future.  The last specific evidence of
T.S.S. actually posing a danger to himself dates back to 2003, when he looked
emaciated and was experiencing delusions that his food was being
poisoned.  The record reflects that RMHS discontinued his treatment in 2008,
and that he was not under any compulsory treatment until 2012.  Even then,
we know only that T.S.S. was charged with unlawful mischief, that he was found
incompetent to stand trial, and that he stipulated to an ONH in connection with
the charges stemming from that incident.  Given this record, we cannot
conclude that T.S.S.’s historical pattern can support a finding that he is
likely to deteriorate to the point of becoming a person in need of treatment in
the near future.

¶ 32.        
This case is quite similar to In re T.C., in which we affirmed
the superior court’s denial of the commissioner’s petition for continued
treatment.  2007 VT 115, ¶ 1.  In that case, the respondent
suffered from paranoid schizophrenia; like the respondent in this case, he did
not acknowledge any mental illness and was opposed to taking medication, which
caused adverse side effects.  The respondent in T.C. was
unmedicated for an extended period of time, yet there was no evidence that the
respondent had been violent or threatening in the recent past.  For that
reason, despite T.C.’s history of violence in the more distant past, we found
that the superior court’s conclusion that T.C. was no longer a patient in need
of continued treatment was supported by the evidence.  Id.
¶¶ 24, 28.

¶ 33.         For
the above reasons, we conclude that the superior court applied the wrong legal
standard to the evidence, and that the evidence and findings do not support a
continued ONH in this case.

The order of
non-hospitalization issued by the superior court on May 27, 2014 is vacated.


 
 
            
 
 
 
  
 
 
 FOR THE COURT:
 
 
 
 
  
 
 
  
 
 
  
 
 
 
 
  
 
 
  
 
 
  
 
 
 
 
  
 
 
  
 
 
  
 
 
 
 
  
 
 
  
 
 
 Associate
 Justice
  
 
 


 

¶ 34.         EATON,
J., concurring.   While I concur fully with the outcome here, I
write separately to underscore my concern with the majority’s reliance upon
witness testimony before a legislative committee in determining legislative
intent.  Ante, ¶¶ 19-23.  It is, of course, our
obligation to construe statutes in a manner that is reflective of legislative
intent, e.g., Town of Calais v. Cnty. Road Comm’rs, 173 Vt.
620, 621, 795 A.2d 1267, 1268 (2002) (mem.); however, resort to
legislative history to ascertain that intent becomes necessary only when a
statute is ambiguous, Cavanaugh v. Abbott Labs., 145 Vt. 516,
530, 496 A.2d 154, 163 (1985).  I question whether any ambiguity
exists concerning this statute, as the constitutional concerns raised by the
construction employed by the trial court seem apparent.  Since it is also
our obligation to construe a statute in a constitutional manner if possible, State v.
Colby, 2009 VT 28, ¶ 7, 185 Vt. 464, 972 A.2d 197, I do
not believe resort to legislative history is necessary here to conclude that
the trial court misconstrued 18 V.S.A. § 7101(16).  We are
capable of giving this statute proper construction without determining
legislative intent and therefore without the need to delve into legislative
history.

¶ 35.         Further,
in determining legislative intent, we have always viewed the testimony of
witnesses before a legislative committee to be of very limited value.  State v.
Madison, 163 Vt. 360, 373, 658 A.2d 536, 545 (1995) (explaining
that witness’s comments at committee hearing “are accorded little weight” in
determining legislative intent).  Such skepticism even extends to the
testimony of legislators concerning legislative intent.  Trudell v.
State, 2013 VT 18, ¶ 27, 193 Vt. 515, 71 A.3d 1235 (“Courts
generally give little weight to an individual legislator’s interpretation of the
law once enacted because it cannot reflect the thought processes of the entire
Legislature.”).  The testimony of non-legislator witnesses
regarding proposed legislation seems of even less value in the determination of
legislative intent.

¶ 36.         Those
testifying before legislative committees vary in their subject-matter expertise
and in their particular interests concerning any piece of legislation. 
Yet, the testimony of each of those witnesses becomes part of the legislative
history and thus potentially available to the Court in the consideration of
legislative intent.  We are ill-equipped to separate the wheat from the
chaff concerning such testimony, and have no way of knowing the extent to which
that testimony played a role, if any, in the adoption of the legislation
ultimately enacted.

¶ 37.         Undoubtedly,
testimony before legislative committees is of great aid at times in helping the
Legislature identify areas of concern regarding proposed legislation. 
When the judiciary undertakes to determine legislative intent, however, we
should consider committee witness testimony only when required.  Even in
those rare circumstances when it is required, we should afford it only slight
weight in ascertaining the intent of the Legislature.  In this case, I do
not believe that consideration of the testimony, regardless of the expertise or
experience of those offering it, is necessary.  Accordingly, I reach my
conclusion that the order of non-hospitalization must be vacated here without
reliance upon any legislative history concerning the enactment of the statute.

¶ 38.         I am
authorized to state that Chief Justice Reiber joins in this concurrence.

 


 
 
  
 
 
  
 
 
  
 
 
 
 
  
 
 
  
 
 
 Associate Justice
 
 


 














[1]  Dr.
Gerretson testified that she believed the charge related to T.S.S. breaking a
window or windows, but acknowledged that she did not observe T.S.S. breaking
any windows, that her information about the allegedly broken windows was
limited, and that T.S.S. denied breaking any windows.  The most we can
infer from this record is that T.S.S. was accused of breaking one or more
windows; we have no evidence that he actually did so.

 





[2]  Dr. Gerretson testified that T.S.S.’s
behavior as far back as 2006 was still relevant “because off medications he
appears to have a repetitive pattern of presentation.”





[3] 
The act was approved on April 19, 1978.  The current 18 V.S.A.
§ 7101(16) and (17) differ from the original 1978 act only in the
following minor respects: the language has been made gender-neutral, the
original phrasing of “person who is suffering from mental illness” has been
changed to “person who has a mental illness,” and a comma has been added. 
2013, No. 96 (Adj. Sess.), § 100.

 





[4]
 S. 103 Mental Health; Commitment and Care: Hearing on S. 103
Before the S. Comm. on Health & Welfare, 1977
(Adj. Sess.) (Mar. 8, 1977) [hereinafter Mar. 8 Hr’g]; S. 45,
S. 103, and S. 144: Hearing on S. 103 Before the S. Comm.
on Health & Welfare, 1977 (Adj. Sess.) (Mar. 30,
1977) [hereinafter Mar. 30 Hr’g].





[5]  This
idea—that dangerousness, not merely lack of insight, is required—was emphasized
throughout hearings on the subject.  Mar. 8 Hr’g
Tr. at 10 (statement of Mr. Bluhm that S. 103 “permits commitment
only if the person is demonstrated to be dangerous and contains . . .
examples of what kinds of things would be considered dangerous”); id. at
58-49 (colloquy between Mr. Bluhm and Sen. Niquette emphasizing that
S. 109 “ends lack-of-insight commitments unless the person is dangerous”);
id. at 61-62 (statement of Mr. Bluhm that under S. 103, “the
paranoid schizophrenic” who has delusions that people are plotting against him
but who is “not dangerous to [himself or herself], . . . not
dangerous to others, and . . . not about to become dangerous” cannot
be compelled to undergo treatment).