VERMONT SUPREME COURT
109 State Street
Montpelier VT 05609-0801
802-828-4774
www.vermontjudiciary.org



Case No.      24-AP-205

*Note: In the case title, an asterisk (\*) indicates an appellant and a double asterisk (\*\*) indicates a cross-appellant.  Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

DECEMBER TERM,   2024

In re D.P.*

}  APPEALED FROM:
}  Superior Court, Orleans Unit,
}  Family Division
}  CASE NO. 24-MH-00099
   Trial Judge: Justin P. Jiron

In the above-entitled cause, the Clerk will enter:

D.P. appeals the family division's order granting the Commissioner of Mental Health's application for his continued involuntary treatment.  We affirm.

In November 2023, a mental-health warrant was issued for D.P.  He was transported to North Country Hospital and evaluated by staff, after which an application for involuntary treatment was filed.  On January 4, 2024, D.P. stipulated to an order of hospitalization committing him to the care and custody of the Commissioner for forty-five days.  The stipulation waived all findings of fact and conclusions of law.  On January 30, 2024, D.P. and the State agreed to modify the order to an order of nonhospitalization, again waiving all findings of fact and conclusions of law.  Shortly before the order was to expire, in February 2024, the State filed an application for continued treatment to extend the duration of D.P.'s nonhospitalization order for up to one year.

The family division held a hearing in May 2024.  The State first presented testimony from Cassidy Keefe, a community rehabilitation treatment coordinator at Northeast Kingdom Human Services (NKHS).  Keefe testified that she was the qualified mental-health professional who initially evaluated D.P. after he was brought to the hospital on a warrant.  She stated that he was agitated and talking about his neighbors killing his dogs and was exhibiting paranoia and delusions.  He was very angry and felt that his neighbors and the government were out to get him. He did not agree that he had a mental illness or to engage in treatment.  He was evaluated by a psychiatrist, who agreed with Keefe's opinion that D.P. needed involuntary treatment.  She had a videoconference with D.P. the next day, and he was still very angry and did not understand the situation.

Keefe met with D.P. again in January 2024, after he had been hospitalized and had begun taking antipsychotic medication.  At that point he was "much different.  He was calm.  I was able to hold a conversation with him."  She met with him again in early April after his medication dosage had been reduced.  He was disheveled, more agitated, and looked angrier than he had

after the hospitalization. This caused Keefe concern. The treatment team decided to increase his dosage again. They met with D.P. in May to inform him. He did not agree but complied with the medication regimen.

The State then presented expert testimony from Michael Abiodun, a psychiatric mental-health nurse practitioner. Abiodun testified that he was D.P.'s psychiatric provider at NKHS. He had met with D.P. four times since February using videoconferencing software. He concluded that D.P. had a delusional disorder based on D.P.'s symptoms of paranoia, false belief that one or more unspecified people were after him and had killed his dog, agitation, and irritability. When Abiodun asked D.P. how he would react if Abiodun or one of the case managers were to pay an unannounced visit to D.P.'s house, D.P. said that if he thought his life was in danger, he would do whatever he could to protect himself. At their February 2024 meeting, D.P. complained of drowsiness and sluggishness. Abiodun decided to halve the dosage of antipsychotic medication. At their next meeting, Abiodun noticed that D.P. was irritable and agitated and had emotional outbursts, indicating that he was regressing. He and the other members of the treatment team decided to increase D.P.'s medication dosage again. D.P. did not agree that he was suffering from a mental illness. Abiodun testified that it was possible that if D.P. stopped taking the medication, he would become a danger to himself or others within a matter of two to four weeks. Abiodun stated that "it could be worse than whatever was happening before November of 2023."

A neighbor of D.P.'s, Catherine Rossi, testified that she recently purchased property across the street from D.P. In November 2023, she went to her property around noon one day to post no-trespassing signs. She had never met D.P. before. As she started to nail a sign into one of her trees, she heard someone shoot approximately seven shots from a handgun in rapid succession very nearby. She felt threatened and turned to face where the shots came from. She saw D.P. coming very quickly toward her. His face was red and he seemed very angry. He "was hollering, you shouldn't be here. You don't have any effing right to be here. What the eff are you doing here?" Rossi attempted to calm him down, but "he just went on about how his neighbors are out to get him, and that they'd killed his dog, and that they were going to kill him. They'd been planning for a long time." His speech was rushed and he didn't make sense. He eventually told Rossi that "[y]ou're just like them. You're all out to get me, and I'm going to get you. I'm going to kill them, and I'm going to kill you." She decided to leave for her safety.

D.P. testified that he let his dog out one day and his neighbors killed his dog. He admitted that he did not know that his dog was killed, but the dog never came back and his neighbor left a message on his answering machine that said "[c]ome get your dog." He stated that some neighbor kids had shot at the back of his barn and tried to take out a window with a pellet gun. He said that people had put nails under his tires and done "hundreds" of other things to him. Regarding the incident with Rossi, he denied that his shooting had anything to do with her but then stated, "I was just trying to keep—make sure people don't come on my property, and I was being vocal about shooting on my property, which was probably a mistake."

The trial court found by clear and convincing evidence that D.P. was a patient in need of further treatment under 18 V.S.A. § 7101(16). The court credited Abiodun's testimony that D.P. suffered from a conditional delusional disorder and that if D.P. was discharged from the order of nonhospitalization, his condition would likely deteriorate, placing the community at risk of harm. This appeal followed.

2

When the Commissioner of Mental Health believes that a patient subject to an order of nonhospitalization "continues to require treatment, the Commissioner shall apply to the court for a determination that the patient is a patient in need of further treatment and for an order of continued treatment." 18 V.S.A. § 7620(a). As relevant here, "a patient in need of further treatment" means "a patient who is receiving adequate treatment, and who, if such treatment is discontinued, presents a substantial probability that in the near future his or her condition will deteriorate and he or she will become a person in need of treatment." Id. § 7101(16)(B). "A person in need of treatment" is defined by statute to mean a person with a mental illness that results in "his or her capacity to exercise self-control, judgment, or discretion in the conduct of his or her affairs and social relations [being] so lessened that he or she poses a danger of harm to himself, to herself, or to others." Id. § 7101(17). A danger of harm to others may be shown through evidence that "by his or her threats or actions he or she has placed others in reasonable fear of physical harm to themselves." Id. § 7101(17)(A)(ii). The State has the burden of proving that a patient is in need of further treatment by clear and convincing evidence. Id. §§ 7616(b); 7621(a).

D.P. argues that there was insufficient evidence to support the court's findings that he suffers from a mental illness and that he is in need of further treatment. When reviewing a trial court's decision on an application for continued treatment, we review the court's factual findings "in the light most favorable to the prevailing party, disregarding the effect of modifying evidence, and we will not set them aside unless they are clearly erroneous." In re T.C., 2007 VT 115, ¶ 12, 182 Vt. 467 (quotation omitted). "We uphold the court's conclusions if they are consistent with the controlling law and are supported by the findings." Id.

The mental-health statute defines "mental illness" to mean "a substantial disorder of thought, mood, perception, orientation, or memory, any of which grossly impairs judgment, behavior, capacity to recognize reality, or ability to meet the ordinary demands of life, but shall not include intellectual disability." 18 V.S.A. § 7101(14). The court's finding that D.P. suffers from a mental illness is supported by the expert testimony of Michael Abiodun, who diagnosed D.P. with conditional delusional disorder. He described D.P.'s symptoms as believing things that were not real, such as that his dog was killed and that his neighbors were out to get him, as well as agitation, irritability, and impaired judgment. Although D.P. argues that the State failed to prove that his dog was not killed or that his neighbors were not out to get him, there was no evidence to support these allegations. Abiodun's description of D.P.'s symptoms was corroborated by testimony from Keefe and Rossi about D.P.'s agitation, threatening behavior, and paranoia about his neighbors and the government. D.P. described his own symptoms to Abiodun as an "episode of psychosis," which Abiodun testified is a component of delusion. This evidence, taken in the light most favorable to the State, was sufficient to support the court's finding that D.P. suffered from a mental illness.

The court's finding that D.P. was a patient in need of further treatment was likewise supported by adequate evidence in the record. Abiodun, the State's expert, testified that if D.P. stopped taking his medication, it was possible he would become a danger to himself or others within a matter of two to four weeks. Abiodun stated that "it could be worse than whatever was happening before November of 2023." At that time, D.P. had accused Rossi, a person he had never met before, of being part of a conspiracy against him and threatened to kill her. D.P. admitted that he was firing his weapon as a warning to others and that he had a psychotic episode. Abiodun's opinion was corroborated by his and Keefe's testimony that when the treatment team reduced D.P.'s medication dosage, D.P.'s paranoia, agitation, and irritability began to reappear. This testimony supports the court's finding that if D.P.'s treatment was

3

discontinued, his capacity to exercise self-control and judgment would soon deteriorate such that he posed a danger to others, and in turn supports its conclusion that he was a patient in need of further treatment.

D.P. argues that the court failed to consider conflicting evidence in assessing whether D.P. was a patient in need of further treatment, pointing to a treatment provider's statements in a February 2024 "ONH Treatment Review Form" that the antipsychotic medication had stabilized D.P. but it was not yet possible to assess his long-term compliance with treatment. This form was not offered or admitted into evidence by either party at the May 2024 hearing and was not part of the record before the trial court. The court therefore was not required to consider the statements contained in the form.

D.P. further argues that the court improperly based its finding of dangerousness on his legal use of his handgun for target practice on his own property. This argument is unpersuasive because this was not the sole basis for the court's finding. The record shows that D.P. directly threatened Rossi's life and told her he would kill his neighbors. He also made comments to hospital staff that it would be easy to get guns and to shoot up the hospital, which could reasonably be interpreted as threatening. There was therefore ample evidence to support the court's finding that D.P. would likely pose a danger to others if his treatment was discontinued. See 18 V.S.A. § 7101(17)(A)(ii) (stating danger to others may be proved through threats of physical harm).

Finally, D.P. argues that the court erred in ordering involuntary medication without finding that there was no less objectionable available treatment. D.P. misconstrues the court's order. The order of nonhospitalization does not authorize D.P.'s providers to administer involuntary medication. Rather, if he does not comply with the order by taking the medications prescribed by his providers, the court may modify its original order to provide for alternative treatment or enter a new hospitalization order. 18 V.S.A. § 7618. The Commissioner did not seek an involuntary medication order here and could not administer involuntary medication without following the process set forth in 18 V.S.A. §§ 7624-7629.

Affirmed.

BY THE COURT:

_____
Paul L. Reiber, Chief Justice

_____
Karen R. Carroll, Associate Justice

_____
William D. Cohen, Associate Justice

4